Timothy and Kim ROCHE, Appellants

v.

UGLY DUCKLING CAR SALES, INC.,
Ugly Duckling Corporation, and Garden Spot Equipment Auction, Inc. t/a
Garden Spot Auto Auction, Appellees

Superior Court of Pennsylvania.

Argued Feb. 15, 2005.

Filed June 20, 2005.

Reargument Denied Aug. 23, 2005.

Daniel L. Hessel, Philadelphia, for appellant.

John R. Ninosky, Lemoyne, for Ugly Duckling, appellee.

Timothy Mullin, Philadelphia, for Garden Spot, appellee.

Before: HUDOCK, STEVENS and BENDER, JJ.

BENDER, J.

¶ 1 Timothy and Kim Roche[1] appeal from the orders entering summary judgment in favor of the defendants, Ugly Ducking Car Sales, Inc., Ugly Ducking Corporation (collectively, "Ugly Duckling"), and Garden Spot Equipment Auction, Inc., t/a Garden Spot Auto Auction ("Garden Spot"). Plaintiff, a police officer, sustained serious injuries when he was hit by a car owned by Ugly Duckling and stolen by juveniles from the property of Garden Spot where it had been parked. The trial court concluded that the defen-

---

**1.** Timothy Roche is the party who sustained physical injuries in this case. His spouse, Kim Roche, brought a loss of consortium claim. "Plaintiff" throughout this opinion is used to refer to Timothy Roche, for purposes of clarity.

dants did not owe a duty of care to Plaintiff. We affirm.

¶ 2 The trial court set forth the following factual summary:

On August 15, 2000, an Ugly Duckling employee [Alan Monico] purchased a number of vehicles at defendant, Garden Spot Auto Auction's (Garden Spot) place of business in Ephrata, Pennsylvania. Among the purchased vehicles were two 1991 Honda Accords. After the vehicles were purchased, the employee moved them to Garden Spot's "dealer parking area" where the vehicles would later be picked up by a transporter hired by Ugly Duckling. The dealer area was an unfenced parking lot where Garden Spot permitted buyers like Ugly Duckling to park their purchased cars. Other auto auctions had comparable dealer parking areas where vehicles were parked in unfenced areas.

The employee locked the doors to all of the purchased cars and put the keys under a paper floor mat in a pick up truck it had also purchased. The key to the pick up truck was placed in the truck's gas cap. Apparently, this was a common practice for dealers like Ugly Duckling who purchased vehicles at Garden Spot.

On August 16–17, 2000, between 10:30 p.m. and 12:00 a.m., [S.F.], [M.L.], [B.P.], [J.P.], and [J.G.] (delinquents) assembled in Ephrata and walked to the Garden Spot Auto Auction (Auction). All of the delinquents were under the age of 18, but for [S.F.]. After walking for about 30–45 minutes, the delinquents arrived at the Auction and deliberately trespassed onto the property. They inspected some of the vehicles that were parked in the dealer parking area. Shortly thereafter, [J.G.] came upon a pick up truck and noticed that the floor mat was "bunched," or that some type of

a bag was underneath the floor mat. [J.G.] tried opening the truck's doors but was unsuccessful because they were locked. [J.G.] then climbed to the rear cab window and forced the windows apart thereby allowing him to crawl into the truck through the rear window.

Once inside the truck, he picked up the bag and saw that it contained keys to various automobiles. After going through the sets of keys, [J.G.] kept a set, and left the other keys in the truck. The delinquents subsequently stole two license plates from two cars parked in a nearby neighborhood. After returning to Garden Spot, the delinquents attached the stolen license plates to the two 1991 Honda Accords Ugly Duckling had purchased, which did not have any license plates attached to them.

The delinquents used the stolen keys to gain access to the Hondas. [S.F.] got into the driver's seat of one of the Hondas and [B.P.] entered as a passenger. [J.G.] got into the driver's seat of the other Honda and [J.P.] and [M.L.] entered as passengers. [J.G.] and [S.F.] decided to drive off with the Hondas knowing that they each did not have a driver's license, and knowing that driving without a driver's license was illegal. [J.G.] noticed that the fuel indicator was on "E," so the two groups traveled to a nearby gas station. While at the gas station, the delinquents deliberately pumped gas into both of the cars and drove away without paying for the gas. After stealing the gas, [J.G.] led the delinquents to Hershey, and eventually pulled into a parking lot where they decided to travel to Perry County to attempt to fraudulently register the cars and obtain license plates.

At that time, Officer Tom Pavone of the Derry Township Police Department was within the vicinity and heard tires

squealing from vehicles that were approaching his direction. After pulling out and following the delinquents, Pavone noticed that the front vehicle was weaving into oncoming traffic while the rear vehicle turned its lights off and on as if it were attempting to signal the front vehicle. Pavone then activated the overhead lights on his vehicle. As the lights were activated, the vehicle [S.F.] was driving pulled out and passed the car being driven by [J.G.]. The vehicle driven by [J.G.] slowed down at first but then accelerated. [J.G.] testified that he was traveling about 120 miles per hour after looking at the speedometer, and because he felt the car shut down as the result of the automatic governor that engaged at 120 miles per hour.

Plaintiff Tim Roche (Roche) was on duty for the Derry Township Police Department at the time and was located near the Hershey Medical Center. After Pavone reported the irregular driving and lights being turned out, Roche traveled toward the "cloverleaf," or the area where Routes 322, 422 and Hersheypark Drive split. Pavone then reported that the vehicles were increasing speed and were not going to pull off of the road. As the chase between Pavone and the delinquents developed, Roche made a U-turn while on Hersheypark Drive and parked his vehicle on the side of the road. Roche retrieved a set of "stop sticks," and stepped into the roadway in an effort to deploy them. After seeing a vehicle with its lights on approach him, Roche determined that he could move a little further into the roadway to position the sticks. Roche then noticed a second vehicle rapidly approaching him. Immediately thereafter, the stolen vehicle driven by [J.G.] struck Roche.

Trial Court Opinion (T.C.O.), 12/15/03, at 1–4.

¶ 3 Plaintiff filed a complaint against Ugly Duckling and Garden Spot on November 27, 2001, in which he alleged that the defendants were jointly responsible for negligently allowing the group of juveniles to steal the vehicle that struck Plaintiff. Ugly Duckling filed a motion for summary judgment on July 8, 2003, and Garden Spot filed a motion for summary judgment on November 7, 2003. By order and opinion dated December 15, 2003, a three-judge *en banc* panel of the trial court granted Ugly Duckling's motion for summary judgment, concluding that Ugly Duckling could not foresee Plaintiff's harm and, therefore, owed no duty of care to Plaintiff. By order and opinion dated April 26, 2004, and docketed on June 26, 2004, another three-judge *en banc* panel of the trial court granted Garden Spot's motion for summary judgment, citing similar reasons. Plaintiff filed a timely appeal from these orders granting the defendants' motions for summary judgment.

¶ 4 Plaintiff raises the following issues in this appeal:

I. Whether the defendants could have foreseen that juveniles might steal their motor vehicles, where the keys to the vehicles were left inside a plastic bag in plain view inside a nearby unlocked pickup truck, which was parked in an unguarded parking lot that had a history of numerous car thefts and incidents of juvenile trespassing?

II. When ruling on the motions for summary judgment, whether the lower court erred in failing to construe critical facts in favor of the non-moving party, and instead basing its decisions on a factual record construed in favor of the moving parties?

III. Whether the Restatement (Second) of Torts, §§ 448 and 449 imposed a duty of care on the defendants under the facts of this case?

Plaintiff's brief at 3 (trial court answers omitted).

 ¶ 5 First, we note the standard and scope of review applicable to orders granting summary judgment:

Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment. As already noted, on appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with

law based on the facts and circumstances before the trial court after hearing and consideration.

*Regscan, Inc. v. Con–Way Transp. Servs.,* 2005 PA Super 176, ¶ 10, 875 A.2d 332 (2005) (quoting *Gutteridge v. A.P. Green Servs.,* 804 A.2d 643, 651 (Pa.Super.2002) (citations omitted), *appeal denied,* 574 Pa. 748, 829 A.2d 1158 (2003)).

 ¶ 6 In his first issue, Plaintiff argues that the trial court erred by concluding, as a matter of law, that the defendants did not owe a duty of care to Plaintiff. In this regard, we first note the following:

It is axiomatic that the elements of a negligence-based cause of action are a duty, a breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss. When considering the question of duty, it is necessary to determine whether a defendant is under any obligation for the benefit of the particular plaintiff ... and, unless there is a duty upon the defendant in favor of the plaintiff which has been breached, there can be no cause of action based upon negligence.

*Minnich v. Yost,* 817 A.2d 538, 541 (Pa.Super.2003) (citations and quotation marks omitted). *See also Zanine v. Gallagher,* 345 Pa.Super. 119, 497 A.2d 1332, 1334 (1985) ("[O]ur courts have emphasized that there can be no negligence where there is no duty of care.").

 ¶ 7 In the instant case, the trial court addressed the element of duty by first examining the relationship between the defendants and Plaintiff, who was a stranger to the defendants at the time of the incident. As this Court has said:

Duty, in any given situation, is predicated upon the relationship existing between the parties at the relevant time. *Zanine v. Gallagher,* 345 Pa.Super. 119,

497 A.2d 1332, 1334 (1985). Where the parties are strangers to each other, such a relationship may be inferred from the general duty imposed on all persons not to place others at risk of harm through their actions. *Id.* The scope of this duty is limited, however, to those risks which are reasonably foreseeable by the actor in the circumstances of the case. *Id.*

> Only when the question of foreseeability is undeniably clear may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff. *Migyanko v. Thistlethwaite,* 275 Pa.Super. 500, 419 A.2d 12, 14 (1980); *see also Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928).

*Hoffman [v. Sun Pipe Line Co.],* 394 Pa.Super. [109,] 115, 575 A.2d [122,] 125 [(1990)] (quoting *Alumni Ass'n v. Sullivan,* 369 Pa.Super. 596, 600–02, 535 A.2d 1095, 1098 (1987), aff'd, 524 Pa. 356, 572 A.2d 1209 (1990)). *See Schmoyer by Schmoyer v. Mexico Forge, Inc.,* 437 Pa.Super. 159, 164–65, 649 A.2d 705, 708 (1994) (unless a special relationship exists between the defendant and plaintiff, the only duty owed by the defendant to the plaintiff is the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury). *See also Feld v. Merriam,* 506 Pa. 383, 392, 485 A.2d 742, 746 (1984) (in general, a person is not liable for the criminal conduct of another in the absence of a special relationship imposing a pre-existing duty); *T.A. v. Allen,* 447 Pa.Super. 302, 669 A.2d 360 (1995) (same); *Elbasher v. Simco Sales Service of Pa.,* 441 Pa.Super. 397, 657 A.2d 983 (1995) (same).

*J.E.J. v. Tri–County Big Brothers/Big Sisters,* 692 A.2d 582, 584–85 (Pa.Super.1997). "Whether a duty exists is ultimately a question of fairness. The inquiry involves weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution." *Campo v. St. Luke's Hosp.,* 755 A.2d 20, 24 (Pa.Super.2000) (quoting *Brandjord v. Hopper,* 455 Pa.Super. 426, 688 A.2d 721, 723 (1997)). "[A] duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *Id.*

¶ 8 In the instant case, where the defendants and Plaintiff were strangers, the trial court applied the general duty of care "required of all persons not to place others at an unreasonable risk of harm by way of their actions." T.C.O., 12/14/03, at 5 (citing *Morena v. South Hills Health Sys.,* 501 Pa. 634, 462 A.2d 680, 684 (1983)). As the trial court correctly noted, the scope of such a duty is " 'limited to those risks that are reasonably foreseeable by the actor in the circumstances of the case.' " *Id.* (quoting *Morena,* 462 A.2d at 684). However, the trial court concluded, with regard to each defendant, that the harm to Plaintiff was not foreseeable and that, therefore, the defendants did not breach a duty of care owed to Plaintiff.

¶ 9 In reaching its decision, the trial court distinguished the case of *Anderson v. Bushong Pontiac Co.,* 404 Pa. 382, 171 A.2d 771 (1961), which is the primary case Plaintiff relies upon. The defendant in *Anderson* was the owner of a used car lot. A fourteen year old boy stole the keys to a Pontiac sedan that was on the lot. The used car lot reported the theft to police, but did nothing more to secure the car that had its keys stolen. At the time the keys were stolen, and for some time prior thereto, the boy who stole the keys and other boys made a habit of playing around the cars in the lot. Two days after the keys were stolen, a different fourteen year old boy used the stolen keys to drive the car out of the lot while the lot was unat-

tended. Our Supreme Court concluded that these facts, as pleaded, were sufficient to state a cause of action against the used car lot, and reversed the trial court's order granting the defendant's preliminary objections in the nature of a demurrer. In its opinion, the Supreme Court stated that it was common knowledge that children less than sixteen years of age lack maturity and the ability to safely drive a car, which is "a potentially dangerous instrumentality, particularly so, when in the control of an incompetent operator." *Id.* at 772. The Court emphasized that the used car lot knew that the keys to the Pontiac had been stolen and that, therefore, starting the car would be easy, and that it knew that children of immature years frequented the lot. *Id.* Despite this knowledge, the used car lot did nothing to secure the car other than report the theft of the keys to police. In the meantime, the car remained in an open and unattended lot. Thus, with regard to foreseeability on the part of the used car lot, the Court stated, "[a]fter the keys had been stolen and such fact was known, it did not require much imagination to realize that the car itself might well be next on the list." *Id.* The Court concluded that the facts as pleaded could establish that it was reasonably foreseeable that a teenager might steal the car and that the plaintiff, a pedestrian, was within the class of persons who may be endangered by the defendant's negligence. *Id.* at 775.

¶ 10 With regard to defendant Ugly Duckling, the trial court in the instant case distinguished *Anderson* by concluding that:

the *Anderson* defendant was on notice that the car could likely be stolen by an incompetent driver for the reason that the keys had been stolen two days earlier, and because minor aged children often played at the lot. However, in this case, Ugly Duckling had no notice at any time that the Hondas, or any other vehi-

cle, may be stolen by an incompetent driver thus creating an unreasonable risk of harm to [Plaintiff].

T.C.O., 12/14/03, at 7. The trial court applied the same analysis to defendant Garden Spot and concluded that "Garden Spot [was] even further removed in the chain of foreseeability than were the Ugly Duckling Defendants" because "Garden Spot merely owned the lot from which the theft occurred, and did not own or control the vehicle" at the time it was stolen. T.C.O., 6/29/04, at 11.

¶ 11 While it distinguished *Anderson*, the trial court analogized the facts of this case to those in *Liney v. Chestnut Motors, Inc.*, 421 Pa. 26, 218 A.2d 336 (1966). The defendant in that case was an automobile repair garage. After the owner of a car delivered his car to the garage for repairs at 10:00 a.m., the garage's employees allowed the car to remain double-parked in the street outside the garage building with the keys in the ignition. Three hours later, the car was stolen by an adult stranger who drove it carelessly, striking the plaintiff-pedestrian on a sidewalk. The garage was located in an area that was experiencing a high and increasing rate of car thefts in the months preceding the incident. On those facts, the trial court in *Liney* sustained the defendant garage's preliminary objections in the nature of a demurrer.

¶ 12 In affirming the trial court's decision, this Court concluded that, even assuming that the employees were negligent, the garage could not have foreseen that its employees' carelessness would result in harm to the plaintiff and, therefore, the defendant garage owed no duty to the plaintiff. *Id.* at 337–338. However, we further concluded that, even assuming that the defendant garage should have foreseen the likelihood of theft, nothing existed that

would have put the garage on notice that the thief would be an incompetent driver. *Id.* at 338. We stated: "Under the circumstances, the thief's careless operation of the automobile was a superceding cause of the injury suffered, and defendant's negligence, if such existed, only a remote cause thereof upon which no action would lie." *Id.* We also distinguished *Anderson* by stating that the defendant in *Anderson* was put on notice that the Pontiac was (1) likely to be stolen, (2) by an incompetent driver. *Id.* Finally, we noted: "It is true that the question of proximate cause is generally for the jury. However, if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law." *Id.*

¶ 13 Similarly, in *Jamison v. Philadelphia*, 355 Pa.Super. 376, 513 A.2d 479 (1986), the trial court sustained the defendant parking lot owner's preliminary objections in the nature of a demurrer. In *Jamison*, a thief stole a car from the defendant's parking lot and engaged police in a high-speed chase resulting in a collision between the stolen car and another car, causing injury to a passenger in the latter car. In concluding that the parking lot operator could not foresee that the thief would operate the car negligently and injure the third-party passenger in the other car, we noted that "one is not to be held liable for all possible consequences" and that, although the injury was a possible consequence of theft, "it was no more probable than the consequence that the thief would drive carefully so as not to attract attention." *Id.* at 481 (quoting *Farley v. Sley Sys. Garages, Inc.*, 13 Pa.D & C2d 680, 688–89 (1958), *reprinted at* 187 Pa.Super. 243, 144 A.2d 600, 605 (1958)).

¶ 14 In *Jamison*, as in *Liney*, we distinguished *Anderson* on the basis that the complaint in *Anderson* alleged specifically that the defendant knew that young boys played in the car lot and knew that the keys to the Pontiac had been stolen two days before the theft of the Pontiac. We reiterated that, under the facts in *Anderson*, it "did not require much imagination[,]" to conclude that the car would be stolen after the theft of the keys, and that the car may fall into the hands of an incompetent teenager; therefore, whether the defendant exercised reasonable prudence was a question for the jury. However, in *Jamison*, we held that, unlike the complaint in *Anderson*, the *Jamison* plaintiff's "complaint did not contain averments of fact sufficient to permit a finding that [the defendant] either knew or should have known that the vehicle was likely to be stolen by an incompetent driver or that the thief would drive the vehicle in a negligent or reckless manner." *Id.* at 481.

¶ 15 In *Farley*, a case that we relied upon in *Jamison*, we affirmed the trial court's entry of judgment notwithstanding the verdict in favor of a defendant parking garage owner. The owner of a car parked it in the defendant's parking garage. The garage's operation required that the keys to the car be kept in the car so that attendants could move the car as needed. The car's owner kept his ignition in a position such that it could be operated without the key. The car was stolen and, when discovered by police, the thief engaged police in a high speed chase that ended when the thief collided with the plaintiff's car.

¶ 16 This Court adopted, *per curiam*, the opinion of the trial court in *Farley*, which concluded that the defendant garage did not owe a duty to the plaintiff:

It is fundamental that one is not to be held liable for all possible consequences, but only for the probable consequences. It is conceded as it must be that the

injury herein complained of was a possible consequence of theft. But, it is *no more probable than the consequence that the thief would drive carefully so as not to attract attention.*

*Farley,* 144 A.2d at 605.

¶ 17 Additionally, *Canavin v. Wilmington Transp. Co.,* 208 Pa.Super. 506, 223 A.2d 902 (1966), supports the trial court's decision in the instant case. In *Canavin,* a pedestrian was hit by the defendant's airport limousine, which had been stolen from the defendant's lot by a fourteen year old boy. The defendant's lot was an open, unfenced lot, next to the airport terminal and several hundred feet from the airport's main entrance. *Id.* at 903. The airport police sometimes patrolled the area, but no security guards were stationed at the lot constantly. On several occasions prior to the theft of the limousine, cars were stolen from a nearby airport parking lot and from other nearby car rental lots. On other numerous prior occasions, "youngsters" vandalized vehicles in the defendant's limousine lot and in nearby lots, and stole items from the vehicles such as hubcaps and other accessories. We recognized that "[y]oung persons and juveniles were a usual problem in and about the airport and they would break into the cars and steal accessories." *Id.* Nevertheless, in reliance on *Liney,* this Court found "no evidence in the . . . record to charge this [defendant] with notice, or cause it to foresee, that a fourteen year old boy would steal and undertake to operate the large airport limousine here involved." *Id.* at 904.

¶ 18 In the instant case, Plaintiff argues that he "presented sufficient evidence to establish that the defendants should have foreseen that juveniles might steal cars and drive them carelessly." Plaintiff's brief at 23. Additionally, Plaintiff argues that the trial court improperly focused upon whether the defendants " 'could have reasonably foreseen that leaving keys to its purchased vehicles in a separately locked pick up truck would eventually lead to [Plaintiff] being injured as the result of a high speed chase after the two vehicles were stolen by the delinquents,' whereas it should have focused on more general questions of whether the defendants could have foreseen that (1) the vehicles might be stolen, (2) by incompetent or careless drivers." Plaintiff's brief at 23–24 (quoting T.C.O., 12/15/03, at 5). In support of this argument, Plaintiff correctly notes that "the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable." *Id.* at 24 (quoting *Ford v. Jeffries,* 474 Pa. 588, 379 A.2d 111, 114 (1977)). Indeed, "[i]f the actor's conduct has created or increased the risk that a particular harm to the plaintiff will occur, and has been a substantial factor in causing that harm, it is immaterial to the actor's liability that the harm is brought about in a manner which no one in his position could possibly have been expected to foresee or anticipate." *Id.* (quoting *Ford,* 379 A.2d at 115). Plaintiff argues that the trial court improperly focused its foreseeability analysis upon whether the detailed sequence of events leading up to Plaintiff's injuries (*e.g.,* stealing license plates to affix to the Hondas, stealing gas, and engaging police in a high speed chase) were foreseeable when it should have merely asked whether the theft of the vehicles by juveniles, who are deemed to be incompetent or careless drivers, was foreseeable.

¶ 19 In support of his argument that Ugly Duckling should have foreseen the thefts by juveniles, Plaintiff cites common sense, the nature of Ugly Duckling's business, the fact that Ugly Duckling gave

directions to its buyers to secure vehicles after purchase, the testimony of Mr. Monico's supervisor who expected that vehicles purchased from an auction be in a secure area with the doors locked until they could be transported, and Mr. Monico's testimony that he was aware of an occasion where keys were stolen from Garden Spot. However, none of this evidence supports Plaintiff's contention that Ugly Duckling knew or should have known that the Hondas would be stolen by juveniles who would drive them in an incompetent or careless manner.

¶ 20 In support of his argument that Garden Spot could have foreseen the thefts by juveniles, Plaintiff cites local police reports showing a history of car thefts and vandalism at Garden Spot. For example, Plaintiff cites a police incident report dated June 4, 1996, in which Bruce Wagner, Garden Spot's general manager from 1996 to early 2000, reported that 15 cars had been vandalized, two of which had been driven off the lot and into a field at the rear of the Garden Spot. Mr. Wagner was informed by police that they had caught the perpetrators of that incident and that they ranged in age from 16 to 20 years old. *See* Wagner Deposition, 2/20/03, at 36–37. James Gephart, Garden Spot's security chief, who worked at Garden Spot since October of 1996, testified that he was aware of "[q]uite a few occasions" in which he discovered trespassers on Garden Spot property. Deposition of Gephart, 2/20/03, at 29. He had to call police on trespassers three to four times over the six or seven years he had worked at Garden Spot. *Id.* at 30. Some of those occasions involved "kids." *Id.* at 31. However, he never encountered kids "doing anything with the cars." *Id.* During the same time period of six to seven years, he encountered two incidents of vandalism and two to three incidents of missing cars that had been treated as lost or stolen by

mistake. *Id.* at 31–32. There is no evidence that "kids" were involved in these incidents. Plaintiff also cites an incident that occurred in June of 2000, where the general manager of Garden Spot at that time, John Willwerth, reported two stolen cars. However, Plaintiff fails to indicate that approximately one month later, it was discovered that the cars were not stolen and that Mr. Willwerth mistakenly filed the report.

¶ 21 In addition to the above evidence, Plaintiff presented two liability expert reports concluding that the theft of the vehicles was reasonably foreseeable based on the history of past incidents at Garden Spot. However, Plaintiff points to no place in either report in which the experts opined that the defendants should have known that the vehicles would be stolen by juveniles who would drive incompetently or carelessly.

¶ 22 Although there is a police record of incidents involving vehicles stolen from Garden Spot, only a few of the incidents implicated juveniles and included crimes such as trespassing and vandalism. These facts are unlike those in *Anderson*, in which the defendant used car lot knew that teenage boys frequently played around the cars and that the keys to a specific vehicle had been stolen two days prior to the vehicle itself, which the lot failed to secure after the keys were stolen. Instead, the evidence Plaintiff presents is similar to that presented in *Canavin*, where the plaintiff presented evidence that the airport area lots close to the defendant's limousine lot experienced car thefts and that the defendant's lot itself suffered incidents of vandalism. Nevertheless, in *Canavin*, we concluded that the evidence was insufficient to support the plaintiff's contention that the defendant should have foreseen that a fourteen year old boy would steal a limousine off the lot and drive it carelessly.

We find the circumstances in the instant case similar to those in *Canavin* and therefore conclude that Garden Spot cannot be charged with foreseeing the theft and careless operation of the Hondas. Additionally, we note that the defendant in *Anderson* owned the car that was driven off its lot. In this case Garden Spot did not own the vehicles and merely provided its lot as a convenience to its customers. Garden Spot did not have control of the vehicles or the keys to the vehicles at the time they were stolen, as it did not own the vehicles. The trial court, in reliance on *Liney*, *Jamison*, and *Canavin*, did not abuse its discretion or commit an error of law by granting defendants' motions for summary judgment.

¶ 23 In his second issue, Plaintiff argues that the trial court failed to view certain material facts in the light most favorable to Plaintiff. Plaintiff argues that the trial court based its conclusion that the defendants could not have foreseen that the vehicles would be stolen on the following findings: (1) the pickup truck containing the keys was locked; (2) the youths had to "forcibly enter the truck;" and (3) the youths entered the "truck before even noticing the keys were under a floor mat." Plaintiff's brief at 34 (quoting T.C.O. at 6). Plaintiff argues that these findings are inconsistent with the testimony of J.G., the youth who found and stole the keys. We disagree.

¶ 24 First, the trial court recognized that the driver's side door to the pick-up truck was locked and the doors to the Hondas were locked. Plaintiff does not dispute these points. Rather, Plaintiff argues that the trial court failed to recognize that the rear window to the pick-up truck was unlocked. However, the trial court did recognize that J.G. entered the truck through the rear window: "[J.G.] tried opening the truck's doors but was unsuccessful because they were locked. [J.G.] then climbed to the rear cab window and forced the windows apart thereby allowing him to crawl into the truck through the rear window." T.C.O. at 2. The trial court thus recognized that the rear window was unlocked.

¶ 25 However, Plaintiff also takes issue with the trial court's characterization of J.G. "forcibly" pulling the rear window panes apart to gain access to the truck. J.G. testified that the driver's side door of the pick-up truck was locked, but when he looked through the driver's side window, he could see that the flip-over latch to the back window was not latched so he "knew [he] could just slide it apart." Deposition of J.G., 5/19/03, at 51. He admitted that he used his hands to force the glass apart. *Id.* The trial court's characterization of J.G. forcibly pulling apart the glass of the rear window was an accurate characterization from the record.

¶ 26 Finally, and despite Plaintiff's claim to the contrary, the record reveals that the keys were not in plain view from the outside of the truck. Although the trial court did indicate that the keys were under the floor mat, and J.G.'s testimony, when viewed in the light most favorable to Plaintiff, indicates that the bag of keys was on top of the floor mat, this inconsistency is not material to the motion for summary judgment for the following reason. Whether the bag was under or on top of the floor mat, J.G. testified that before he entered the truck, he could not see what was in the bag, just that it "had something in it" and that is when he "went through the window to look and seen [sic] it was keys." Deposition of J.G., 5/19/03, at 50. Accordingly, we find Plaintiff's second issue to be without merit, as he failed to persuade us that the trial court did not view the facts in the light most favorable to Plaintiff when deciding the defendants' motions for summary judgment.

¶ 27 Finally, Plaintiff argues that the defendants owed him a legal duty under sections 448 and 449 of the Restatement (Second) of Torts. These sections provide as follows:

§ 448. Intentionally Tortious Or Criminal Acts Done Under Opportunity Afforded By Actor's Negligence

The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

Restatement (Second) of Torts § 448 (1965). *See also Ford*, 379 A.2d at 115 (applying this provision in context of liability for damage from fire of adjacent property).

§ 449. Tortious Or Criminal Acts The Probability Of Which Makes Actor's Conduct Negligent

If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.

Restatement (Second) of Torts § 449 (1965). Comment a to this section provides that "[i]t is only where the actor is under a duty to the other, because of some relation between them, to protect him against such misconduct, or where the actor has undertaken the obligation of doing so, or his conduct has created or increased the risk of harm through the misconduct, that he becomes negligent." Indeed, the *Farley* Court stated that a duty must attach before either section 448 or section 449 can be deemed applicable. *Farley*, 144 A.2d at 604. Since we have previously determined that the trial court did not err by concluding that the defendants did not owe a duty of care to Plaintiff, we find that the two Restatement sections relied upon by Plaintiff are inapplicable here.

¶ 28 For the foregoing reasons, we affirm the orders granting summary judgment in favor of the defendants.

¶ 29 Orders affirmed.