Paula (Livingston) GRESIK, Individually and as Administratrix of The Estate of Gerald Livingston, Jr., Appellant

v.

PA PARTNERS, L.P., Appellee.

Joseph L. Beltowski and Karen M. Beltowski, his Wife

v.

PA Partners, L.P., Appellant

v.

Paula (Livingston) Gresik, Individually, and as Administratrix of The Estate of Gerald Livingston, Jr.,

v.

PA Partners, L.P.

Joseph L. Beltowski and Karen M. Beltowski, his Wife, Appellants

v.

PA Partners, L.P.

Joseph L. Beltowski and Karen M. Beltowski, his Wife

v.

PA Partners, L.P.

Superior Court of Pennsylvania.

Argued Sept. 22, 2009.
Filed Dec. 23, 2009.

James M. Jacobs, Jr., Somerset, for Beltowski, J., Beltowski, K. and Gresik.

Frederick W. Bode, III, Pittsburgh, for PA Partners.

BEFORE: FORD ELLIOTT, P.J.,
ORIE MELVIN and BENDER, JJ.

OPINION BY BENDER, J.:

¶1 Joseph Beltowski, Karen Beltowski, his wife, and Paula Livingston Gresik, individually and as the administratrix of the estate of Gerald Livingston, Jr. (Plaintiffs), appeal from the order entering summary judgment in favor of PA Partners, L.P. (Defendant), in Plaintiffs' action against Defendant arising from an accident that occurred in a steel mill previously owned by Defendant. For the reasons that follow, we affirm.

¶2 In two separate opinions, the trial court set forth the facts and the procedural history of this case as follows:

Defendants owned and operated a steel plant located near Hollsopple, Somerset County, Pennsylvania, from approximately December 1, 1983 until December 21, 1988. During their tenure as owners/operators of this steel plant, Defendants modified the equipment and operations of the plant to produce steel ingots rather than steel wheels for railroad cars. Among the modifications made to the steel plant were the reduction in size of the fire bricks lining the electric furnace's interior sides and removal of a layer of fire bricks from the bottom of the electric furnace.

On two occasions between May 1984 and December 1988, during the Defendants' ownership of the steel plant, a "burn through" occurred. A "burn through" occurs when the molten steel located within the electric furnace burns through the fire brick lining of the electric furnace as well as the electric furnace shell wall and flows out of the electric furnace itself. On each of these two occasions, the molten steel that burned through the electric furnace shell wall came in contact with a four to six inch water line that supplied water to the cooling panels on the furnaces. This contact in turn caused the water line to rupture and create steam explosions that spewed steam and debris onto the pouring platform below where the electric furnace operators were located. The first "burn through" occurred on electric furnace number one and the second "burn through" occurred on furnace number two. The "burn through" on electric furnace number two resulted in a rupture of a water line that supplied water to the furnace's cooling panels and a steam explosion resulted. However, a worker on the pouring platform escaped the effects of the steam explosion by exiting from the pouring platform by way of an "access draw bridge" that connected the pouring platforms between furnaces number one and two. Some time after the second "burn through" and prior to December 21, 1988, Defendants removed the "access draw bridge" in order to facilitate the operation of the steel plant's overhead cranes.

On December 21, 1988, Defendants sold their interest in the Hollsopple steel plant to Stonycreek Steel, Inc. Thereafter, Stonycreek Steel, Inc. essentially rehired the management and plant workers who had worked for the Defendants in the steel plant and operated the plant in the same manner as the Defendants, namely for steel ingot production. Stonycreek Steel, Inc., later operated under the name of FirstMiss Steel, Inc.

On June 8, 1994, Gerald L. Livingston, Jr., (hereinafter "Decedent") and Joseph L. Beltowski, employees of Stonycreek Steel, Inc., were operating electric furnace number one at the Hollsopple steel plant. At 4:30 a.m., a "burn through" occurred causing molten steel to exit the electric furnace and come into contact with a four to six inch water line which

supplied water to the cooling panels of the electric furnace. The water line was not "armored" or "shielded" to prevent molten steel from coming into contact with the line in the event of a "burn through." A series of steam explosions resulted which caused hot steel fragments and parts of the plant's pollution control "dog house" structure to fall onto the pouring platform and strike Decedent and Mr. Beltowski who stood on the pouring platform. There were no means of escape for the Decedent and Mr. Beltowski. As a result of the explosions, the plant lost electric power for the protective overhead electric doors on the pouring platform and the pouring platform was also without lighting. As a result, Decedent died and Mr. Beltowski suffered severe injuries including burns of approximately forty percent of his body.

Trial Court Opinion (T.C.O.), 11/21/02, at 2–4.

Both Plaintiffs subsequently filed civil actions against numerous businesses and corporations associated with the steel mill. Following many years of litigation, only one Defendant remains in the suit today. Similarly, only one viable cause of action remains to be addressed, namely whether Defendant, as seller of the steel mill, can be held liable to Plaintiffs under the RESTATEMENT (SECOND) OF TORTS § 353 pertaining to undisclosed dangerous conditions known to a vendor. The sole Defendant has now called upon this court to [1] reconsider its prior ruling on the Second Motion for Summary Judgment following receipt of additional pre-trial deposition testimony, and [2] to review the "Law of the Case" as previously espoused by [the] Honorable Judge Kim Gibson in his previous interlocutory ruling on Summary Judgment.

T.C.O., 8/1/08, at 2–3. The trial court granted Defendant's Third Motion for Summary Judgment and Plaintiffs then filed this appeal raising four questions for our review. Defendant has filed a cross-appeal, requesting that if we conclude that the trial court erroneously granted Defendant's Third Motion for Summary Judgment, we consider the two issues presented in its cross-appeal. As we here conclude that the trial court did not err in granting the motion, we do not reach the issues presented by Defendant in its cross-appeal.

¶ 3 In their brief, Plaintiffs present four questions for our review:

I. Did the Lower Court err in sustaining the Demurrers to/and or striking portions of the Plaintiff/Appellants' initial and Amended Complaints?

II. Did the Lower Court commit an error of Law in granting Summary Judgment insofar as it created an exception to the holding of *Houseman v. Girard Mutual Building and Loan Association* without any controlling legal authority?

III. Did the Lower Court commit an error of Law in granting Summary Judgment insofar as it essentially denied the Plaintiff/Appellants' recovery by the imputation of their employer's negligence to their claims in violation of case Law?

IV. Did the Lower Court err in failing to recognize a cause of action for negligent training and sustain the Demurrers to the Plaintiff's allegations of improper negligent operational training of the plants [sic] work force[?]

Brief for Appellant at 5.

¶ 4 In the first question presented for our review, Plaintiffs claim that the

trial court erred in granting Defendant's preliminary objections.

In determining whether the trial court properly sustained preliminary objections, the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the sufficiency of the facts averred. The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion. When sustaining the trial court's ruling will result in the denial of claim or a dismissal of suit, preliminary objections will be sustained only where the case is free and clear of doubt.

*Floors, Inc. v. Altig,* 963 A.2d 912, 915 (Pa.Super.2009). In the instant case, Plaintiffs challenge the trial court's grant of Defendant's preliminary objections in the form of a demurrer. "When reviewing the dismissal of a complaint based upon preliminary objections in the nature of a demurrer, we treat as true all well-pleaded material, factual averments and all inferences fairly deducible therefrom." *Burgoyne v. Pinecrest Community Assoc.,* 924 A.2d 675, 679 (Pa.Super.2007).

¶ 5 Plaintiffs have divided their first question presented for review into two parts. In the first part, they argue that Defendant could have been held liable under a theory of contractor and/or engineer negligence under Section 385 of the RESTATEMENT (SECOND) OF TORTS, and therefore, the trial court erred in striking that part of Plaintiffs' complaint premised on this section. Section 385 states:

§ 385. Persons Creating Artificial Conditions On Land On Behalf Of Possessor: Physical Harm Caused After Work Has Been Accepted

One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others upon or outside of the land for physical harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others.

RESTATEMENT (SECOND) OF TORTS § 385. Plaintiffs claim that Defendant's removal of the access draw bridge created a danger, and therefore, could have been found to constitute "negligent construction" thereby supporting a cause of action under Section 385. Brief for Plaintiffs at 19.

¶ 6 We begin our analysis of this claim by noting that Plaintiffs' invocation of this section is dubious when one considers that it is part of Topic Eight, which is titled, "Liability of Persons **Other Than** a Possessor, Vendor, or Lessor." RESTATEMENT (SECOND) OF TORTS, Division 2, Chapter 13, Topic 8 (emphasis added). At the time of the Defendant's alleged "negligent construction" it was in fact the *possessor* of the steel mill, which it subsequently sold, thereby becoming the *vendor* of the mill. Thus, at all times relevant hereto, Defendant was *other than* those intended to be held liable under Section 385.

¶ 7 Recognizing this wrinkle in their argument, Plaintiffs argue that Defendant acted in a "dual capacity," which brings it within the purview of Section 385. Brief for Plaintiffs at 19. In support of this argument, Plaintiffs cite *Strothman v. Houggy,* 186 Pa.Super. 638, 142 A.2d 769 (1958). In *Strothman,* the plaintiffs sued their landlords, who built the home that

they leased to the plaintiffs, for negligence arising from the improper construction of a mantel that became dislodged and injured a small child. The matter proceeded to a trial before a jury, which returned a guilty verdict. The defendant landlords moved for *J.N.O.V.*, claiming than an exculpatory clause in the lease barred the action against them. The trial court denied the motion.

¶ 8 On appeal to this Court, we considered the import of Section *358* of the RESTATEMENT OF TORTS, regarding the liability of a lessor of land. Our analysis contains no reference to Section *385* of the RESTATEMENT (SECOND) OF TORTS. More importantly, although we later discussed the fact that the defendants may have been held liable as contractors, we concluded that it was not "necessary, in this case, to go beyond the relationship of lessor and lessee." *Strothman*, 142 A.2d at 772. Reviewing the exculpatory clause and the nature of the negligence, we stated:

> [T]he clause did not specifically release the lessor for negligence which did not 'arise * * * during the term.' Since the unsafe construction of the mantel existed prior to the commencement of the term, with the knowledge of the lessors and without the knowledge of the lessees, the release by its own terms is inapplicable.

*Id.* at 772. Based on the foregoing, we concluded that the trial court correctly denied the defendants' motion for *J.N.O.V.* Since our holding in *Strothman* was based on the liability arising from the lessor-lessee relationship between the plaintiffs and the defendants and because our analy-sis contains no discussion of Section 385, we find it to be of no avail to Plaintiffs.

¶ 9 Plaintiffs also cite *Gilbert v. Consolidated Rail Corp.*, 154 Pa.Cmwlth. 249, 623 A.2d 873 (Pa.Cmwlth.1993), in support of their argument that Defendant could be held liable under Section 385. In *Gilbert*, the plaintiffs' son was killed when he was struck by a train while crossing a wooden walkway over a railroad track. Although the station where this occurred was at the time owned and operated by the Southeastern Pennsylvania Transportation Authority (SEPTA), it was previously operated by Conrail, whose employees built the walkway where the accident occurred.

¶ 10 The plaintiffs sued Conrail for wrongful death, asserting that it negligently designed and constructed the walkway in question. Conrail moved for summary judgment, and for purposes of the motion, it admitted that it should have known that the crossing was dangerous. The trial court granted the motion on two bases. First, it concluded that Conrail could not be held liable because SEPTA directed the construction of the crossing, SEPTA was operating the station at the time of the accident, and if there was a danger, such danger was not latent, but rather open and obvious. Second, the trial court concluded that summary judgment was also appropriate because the decedent was more than fifty percent negligent as a matter of law.

¶ 11 On appeal to the Commonwealth Court, the court addressed two issues: (1) whether under Section 385, Conrail could have been held liable for the danger it created; and (2) whether the trial court erred in concluding that the decedent was over fifty percent comparatively negligent as a matter of law.[1] The Commonwealth

---

1. We note that it does not appear that Conrail presented the argument that Defendant has presented here, *i.e.*, that it cannot be held liable because at all times relevant hereto it was either a possessor or a vendor of the property, and therefore, Section 385 was not intended to impose liability under such circumstances. The case contains no discussion of this issue.

Court found error in the trial court's decision on both these issues and reversed. For purposes of this appeal, we are concerned with the Commonwealth Court's disposition of the first issue.

¶ 12 Central to the court's analysis of this issue was Comment (c) of Section 385, which states:

> A manufacturer of a chattel who puts it upon the market knowing it to be dangerous *and having no reason to expect that those who use it will realize its actual condition* is liable for physical harm caused by its use (see § 394). As the liability of a servant or an independent contractor who erects a structure upon land or otherwise changes its physical condition is determined by the same rules as those which determine the liability of a manufacturer of a chattel, it follows that such a servant or contractor who turns over the land *with knowledge that his work has made it dangerous in a manner unlikely to be discovered by the possessor* is subject to liability both to the possessor, and to those who come upon the land with the consent of the possessor or who are likely to be in its vicinity.

RESTATEMENT (SECOND) OF TORTS § 385 Comment (c) (emphasis added). In *Gilbert,* the trial court had determined that under Comment (c), a plaintiff must show that the dangerous condition was a latent one that was unlikely to be discovered by the possessor. *Gilbert,* 623 A.2d at 875. On appeal, the Commonwealth Court disagreed, finding instead that "Section 385 limits liability to third persons, while comment (c) provides for potential liability to third persons and the possessor of the property when the condition may be considered a latent defect." *Id.*

¶ 13 However, this interpretation was disputed by the dissent, which interpreted the phrase "unlikely to be discovered" in

Comment (c) as implying that the condition "be latent and therefore not open or obvious in order for liability to attach." *Id.* at 877–78. We find the dissent's analysis to be the sound one, and therefore, we decline to follow the holding of *Gilbert. See McCray v. Pennsylvania Dept. of Corrections,* 582 Pa. 440, 872 A.2d 1127, 1130 n. 12 (2005) (stating "Although the Superior Court and the Commonwealth Court each is bound to give due consideration to the decisions and reasoning of the other, neither is bound to follow as controlling precedent the decisions of the other.") (quotation marks omitted).

¶ 14 We reach this conclusion based on the plain language of Comment (c), which, as the dissent noted, the majority completely overlooked. On two occasions, the comment states that the danger must be of such a nature that it is unlikely to be discovered. Liability under Section 385 is determined by the same rules defining the liability of a manufacturer of chattel. The first sentence of Comment (c) states that a manufacturer of chattel is liable when it supplies a product "knowing it to be dangerous *and having no reason to expect that those who use it will realize its actual condition.*" RESTATEMENT (SECOND) OF TORTS § 385 Comment (c) (emphasis added). *See also* RESTATEMENT (SECOND) OF TORTS § 388, Chattel Known To Be Dangerous For Intended Use (stating that a supplier of chattel that is known to be dangerous may only be held liable if the supplier "has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition"). The comment concludes that it follows, therefore, "that a servant or contractor who turns over the land *with knowledge that his work has made it dangerous in a manner unlikely to be discovered by the possessor* is subject to liability." *Id.* Based on the foregoing, we conclude that as a

precondition for establishing liability under Section 385, a plaintiff must show that the danger was one unlikely to be discovered by the possessor or those who come upon the land with the possessor's consent.

¶ 15 In *Gilbert*, the dissent applied this rule and concluded that the trial court properly granted summary judgment because the danger was of such a nature that it should have become immediately apparent to the decedent. Aside from the obvious danger that one apprehends upon the approach of any railroad crossing, SEPTA had posted two signs, which stated, "CAUTION STOP LOOK AND LISTEN" and "CAUTION Look Before Crossing." *Gilbert*, 623 A.2d at 878. The dissent concluded that as a matter of law, there could be no issue as to the fact that the danger was not one that was unlikely to be discovered.

¶ 16 Applying these principles to the instant appeal, we begin by noting that Plaintiffs' sparse argument relying on *Gilbert* claims only that they "should be treated as [the] Defendants ... in [*Gilbert*]." Brief for Plaintiffs at 20. However, as stated above, we decline to follow *Gilbert*. Moreover, Plaintiffs do not direct us to that portion of their Complaint indicating where they averred that the danger created by Defendant was of such a nature that it was unlikely to be discovered by Plaintiffs or the possessor of the steel mill at the time of the accident.[2] And the inescapable facts of this case show that Defendant's employees and management remained working at the steel mill after Defendant sold the mill to Stonycreek. In their brief, Plaintiffs admit that "it is clear that employees of the Defendants Pa. Partners who became First Mississippi employees en mass knew of the Codeck

escape incident, the removal of the access bridge, and the danger of "hot spots" becoming "burn throughs" and resulting in steam explosions. Brief for Plaintiffs at 13. Under these circumstances, we conclude that the trial court did not err in granting Defendant's preliminary objections to Plaintiffs' claims based on Section 385 because this case involves a danger that was well known to all the relevant parties.

¶ 17 In the next part of their first question, Plaintiffs claim that the trial court erred in granting Defendant's demurrer to their cause of action based on the breach of a "general social duty not to harm others." Brief for Plaintiffs at 21. Among the cases that Plaintiffs cite in support of this claim is *Roche v. Ugly Duckling Car Sales*, 879 A.2d 785 (Pa.Super.2007), wherein we stated:

> It is axiomatic that the elements of a negligence-based cause of action are a duty, a breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss. When considering the question of duty, it is necessary to determine whether a defendant is under any obligation for the benefit of the particular plaintiff ... and, unless there is a duty upon the defendant in favor of the plaintiff which has been breached, there can be no cause of action based upon negligence.
>
> . . .
>
> Duty, in any given situation, is predicated upon the **relationship existing between the parties at the relevant time.** Where the parties are strangers to each other, such a relationship may be inferred from the general duty imposed on all persons not to place others

---

**2.** Although Plaintiffs later claim that knowledge of the dangerous condition could not have been imputed to the owners of the steel

mill based on the Plaintiffs' interpretation of the rules of agency, for the reasons below, we find this claim to be without merit.

at risk of harm through their actions. The scope of this duty is limited, however, to those risks which are reasonably foreseeable by the actor in the circumstances of the case.

*Id.* at 789 (emphasis added) (citations omitted).

¶ 18 The essence of this claim is that Defendant breached a duty of care to the decedent and to Beltowski, who then suffered injuries from an accident that occurred several years after this employment relationship was terminated and while they were employed by a new employer. Plaintiffs have failed to cite a single case that even remotely supports a claim of negligence under these circumstances. Had this regrettable accident occurred while Defendant was still the employer, then the injured employees would certainly have had a claim against Defendant. But rather than sue under a cause of action for negligence, the injured employees would have been required to proceed under the workers' compensation law. Our Supreme Court has recently explained this relationship as follows:

In Pennsylvania, workers' compensation proceedings are distinct and separate from civil actions. The two have different substantive and procedural provisions and remedies. The tribunals vested with original and initial appellate jurisdiction are likewise distinct. In enacting the Act, the Legislature *replaced* what was previously a civil action with a statutorily prescribed comprehensive administrative system of substantive, procedural, and remedial laws, which provide the *exclusive* forum for redress of injuries in any way related to the work place. The Act is the *exclusive* means for obtaining compensation for injuries which has been *substituted* for common law tort actions between employees and employers. All will agree that [the

Act's] primary and general purpose was to *substitute* a method of accident insurance in place of common law rights and liabilities for substantially all employees, except such as are by express terms or necessary implication excluded from its operation. As aptly stated by the United States Supreme Court:

Historically, workmen's compensation statutes were the offspring of a desire to give injured workers a quicker and more certain recovery than can be obtained from tort suits based on negligence and subject to common-law defenses to such suits. Thus *compensation laws are practically always thought of as substitutes for, not supplements to, common-law tort actions.*

*East v. W.C.A.B.*, 574 Pa. 16, 828 A.2d 1016, 1020 (2003) (citations and quotation marks omitted). Based on the foregoing and Plaintiffs failure to cite any pertinent law in support of their claim, we find this issue to be without merit.

¶ 19 In the second question presented for our review, Plaintiffs claim that the trial court erred in granting summary judgment on their negligence claim based on the duty of care owed by a vendor of land to the vendee and others. Pursuant to Pa.R.C.P. 1035.2, summary judgment is appropriate where "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action . . . which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2(1). "In reviewing this matter, as with all summary judgment cases, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Ertel v. Patriot–News Co.*, 544 Pa. 93, 674 A.2d 1038, 1041 (1996). However, "failure of a non-moving party to adduce

sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict in its favor establishes the entitlement of the moving party to judgment as a matter of law." *Young v. Com. Dept. of Transp.,* 560 Pa. 373, 744 A.2d 1276, 1277 (2000).

■ ¶ 20 Here, Plaintiffs claim that as the vendor of the steel mill, Defendant owed the vendee a duty to disclose the dangerous conditions which caused the accident in this case. The general rule of liability for a vendor of land is that the vendor "is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession." RESTATEMENT (SECOND) OF TORTS § 352. There is an exception to this rule under Section 353, which in pertinent part states:

§ 353. Undisclosed Dangerous Conditions Known To Vendor

(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) **the vendee does not know or have reason to know of the condition or the risk involved,** and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has **reason to believe that the vendee will not discover the condition or realize the risk.**

RESTATEMENT (SECOND) OF TORTS § 353 (emphasis added). Plaintiffs claim that they had a viable cause of action against Defendant because it failed to disclose the dangerous conditions to the vendee who purchased the steel mill. While Plaintiffs acknowledge that when the vendee purchased the mill, it re-hired all of the management and employees who had worked for Defendant, Plaintiffs claim that these employees' knowledge of the dangerous condition could not be imputed to the vendee purchaser of the mill. The trial court rejected this theory, concluding instead that "pursuant to long-standing agency principles, the vendee-buyer knew (or should have known) of the dangerous condition since the steel mill employees remained the same before and after the sale." T.C.O., 8/1/08, at 6.

¶ 21 In reaching this conclusion, the trial court relied on the RESTATEMENT (THIRD) OF AGENCY § 5.03, which states:

§ 5.03 Imputation Of Notice Of Fact To Principal

For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent

(a) acts adversely to the principal as stated in § 5.04, or

(b) is subject to a duty to another not to disclose the fact to the principal.

Applying Section 5.03, the trial court reasoned that the knowledge of the dangerous condition, acquired by the mill's employees and management while working for Defendant, was imputable to the principal, who was the vendee purchaser of the steel mill. *See Texas Eastern Transmission Corporation PCB Contamination Insurance Coverage Litigation,* 870 F.Supp. 1293, 1307 (E.D.Pa.1992) (stating that "knowledge ac-

quired by employees within the scope of their employment is imputed to the corporation"); *City of Philadelphia, Pa. v. Westinghouse Elec. Corp.,* 205 F.Supp. 830, 831 (E.D.Pa.1962) (stating, "A corporation acquires knowledge through its officers and agents 'and is charged with knowledge of all material facts of which they acquire knowledge while acting in the course of their employment and within the scope of their authority, even though they do not in fact communicate it.' ") (citing 19 C.J.S. Corporations § 1078).

¶ 22 To parse this out for the purpose of clarity, the undisputed facts show the following. While working for Defendant, the mill's employees and management gained knowledge of the dangerous condition that caused the accident underlying this case. When Defendant sold the mill to Stonycreek, the employees and management remained working at and running the mill. Defendant, as vendor of the mill, did not inform Stonycreek, as vendee of the mill, of the dangerous condition. Under Section 353, Defendant, as vendor, would be liable for injuries that arose from that dangerous condition if it had "reason to believe that the vendee will not discover the condition or realize the risk." RE-STATEMENT (SECOND) OF TORTS § 353 (emphasis added). Under principles of agency law, at the time of the sale, Stonycreek was the corporate employer of the management and employees who ran the mill, and therefore, their relationship was one of principal and agent.

¶ 23 This brings us to the matter disputed in this case. The trial court concluded that the knowledge acquired by Defendant's management and employees *during their tenure under Defendant* was imputable to Stonycreek, since it was the principal of these agents after the sale, and therefore, Defendant had no reason to believe that Stonycreek would not discover the dangerous condition, thereby relieving Defendant of liability under Section 353. Plaintiffs claim, however, that this knowledge could not be imputed to Stonycreek because knowledge of the dangerous condition *was acquired before the mill's management and employees became employed by Stonycreek,* when there was no agency relationship.

¶ 24 In support of their argument, Plaintiffs cite *Houseman v. Girard Mutual Building and Loan Ass'n,* 81 Pa. 256, 1876 WL 13855 (Pa.1876), for the proposition that an agent's knowledge of particular facts can only be imputed to the principal when such knowledge was acquired during the course of the agency. In *Houseman,* an individual named Charles Leslie applied for a loan from Girard Mutual Building and Loan Association and offered a mortgage as security for the loan. Girard's conveyancer, who was charged with obtaining a title search on the property, then hired Leslie himself to conduct the title search. Leslie procured a title search certificate from the Recorder of Deeds, John Houseman, showing no outstanding mortgages on the property. In fact, there was another mortgage on the property, and when Leslie defaulted on the loan to Girard, it was unable to obtain any of the proceeds from the sale of the mortgaged property due to its inferior lien position.

¶ 25 Girard then sued Houseman for damages for issuing a false certificate of search. Houseman sought to deflect liability by claiming that since Leslie was Girard's agent, Girard, as principal, was charged with the knowledge possessed by Leslie regarding the existence of the prior mortgage. Thus, the case turned on whether Girard in fact had *notice* of the prior mortgage. Our Supreme Court reasoned that *notice* of the prior mortgage was not imputable to Girard because Leslie acquired the knowledge of the mort-

gage prior to the establishment of the agency relationship between Girard and Leslie.

It is urged, that by the employment of the owner as the agent for this purpose, the defendants are affected with this knowledge of the existence of the mortgage, which was omitted in the certificate. This is a very familiar principle and well settled. But it is equally well settled that the principal is only to be affected by knowledge acquired in the course of the business in which the agent was employed. . . . It may support the reasonableness of the rule to consider that the memory of men is fallible in the very best, and varies in different men. But the true reason of the limitation is a technical one, that it is only during the agency that the agent represents, and stands in the shoes of his principal. **Notice** to him is then notice to his principal. **Notice** to him twenty-four hours before the relation commenced is no more **notice** than twenty-four hours after it had ceased would be. **Knowledge can be no better than direct actual notice.**

1876 WL 13855 at *6 (emphasis added).

¶ 26 While we agree with Plaintiffs that *Houseman* is still binding precedent, we find it to be inapplicable to the case before us. On appeal, Defendant argues that *Houseman* is distinguishable on the basis that it was a case involving fraud, and therefore, was an exception to the general rule that knowledge of an agent is imputable to the principal. We conclude that this is only a distinction without difference, for as the court's language makes clear, knowledge obtained by an agent prior to the establishment of the agency relationship is not imputable to the principal.

¶ 27 Rather, the reason we find *Houseman* to be inapplicable is that the agency principle discussed therein has no bearing on the factual circumstances before us. Whereas *Houseman* dealt with notice, as that term is used in the context of cases discussing mortgage priorities, here we are concerned with the applicability of Section 353 under which the question is whether a vendor has "reason to believe" that the vendee will not discover a dangerous condition or apprehend the risk. RESTATEMENT (SECOND) OF TORTS § 353. The defendant in *Houseman* sought to impute Girard with notice of the prior mortgage as a matter of law, through the operation of the rules of agency, even though Girard did not in fact know of the prior mortgage. Yet here we are concerned with whether Defendant, as a matter of fact, had *reason to believe* that Stonycreek would not become aware of the dangerous condition that caused the accident.

¶ 28 We conclude that based on the record before us, Plaintiffs failed to set forth sufficient facts to establish that Defendant had reason to believe that Stonycreek would not become aware of the dangerous condition. While the crucial point is that Defendant's management and employees remained working at the mill after the sale, the significance of this fact does not relate to whether Stonycreek was their principal and was therefore charged with their knowledge of the dangerous condition through operation of agency law. Instead, our focus is on what Defendant had reason to believe would occur in the relationship between Stonycreek and its new management and employees. Defendant would certainly expect that the management and employees would relate all matters relevant to the operation of the mill to Stonycreek. Clearly, that was the purpose behind Stonycreek's decision to rehire Defendant's workforce, as they were certainly the ones most capable to continue the operation of the mill. Thus, Defendant had reason to believe that through its former

employees and management, Stonycreek would become aware of how the mill was operating, what equipment needed to be repaired or refurbished, at what percentage of capacity the mill was producing, whether there were labor problems, and for purposes of this case, whether there were any safety issues that needed to be addressed. These are the normal duties that the ownership would expect from any employees or management. Consequently, the record establishes that Defendant had no *reason to believe* that Stonycreek would not become aware of the dangerous condition that caused the accident. Accordingly, we conclude that Plaintiffs' second question is to no avail.[3]

¶ 29 In the third question presented for our review, Plaintiffs claim that the trial court erred in granting summary judgment because the court's ruling permitted Defendant to impute Stonycreek's negligence to the decedent and Beltowski. Plaintiffs cite *Lambert v. Pittsburgh Bridge and Iron Works*, 463 Pa. 237, 344 A.2d 810 (1975), in support of this claim. However, the issue considered in *Lambert* was whether the trial court should have instructed the jury that Section 388 of the RESTATEMENT (SECOND) OF TORTS was the applicable law rather than Section 392. These sections address the liability of a supplier of chattel and neither one of these sections is at issue in this case. Consequently, we conclude that Plaintiffs are not entitled to relief on their third question.

¶ 30 In the fourth question presented for our review, Plaintiffs claim that the trial court failed to recognize a cause of action for negligent training. Plaintiffs claim that Defendant, as the employer of decedent and Beltowski, was negligent in its training and instruction of its workforce. For the reasons explained in our disposition of Plaintiffs' claim against Defendant's for its breach of a social duty to Plaintiffs, we here find no merit to Plaintiffs' fourth question.

¶ 31 Order affirmed. Application to Dismiss for Failure to File a Designation of Reproduced Record denied.

---

3. To the extent that our decision may be construed as employing an analysis different than that used by the trial court, we note that "[w]e are not bound by the trial court's ratio-nale, and may affirm its ruling on any basis." *The Brickman Group, Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 928 (Pa.Super.2004).