J-A05011-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| WENDY CAMLIN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THE OFFICE OF THE COMMISSIONER | : | No. 796 WDA 2019 |
| OF BASEBALL, D/B/A MAJOR LEAGUE | : | |
| BASEBALL; PITTSBURGH | : | |
| ASSOCIATES, LP, D/B/A THE | : | |
| PITTSBURGH PIRATES; SPORTS AND | : | |
| EXHIBITION AUTHORITY OF | : | |
| PITTSBURGH AND ALLEGHENY | : | |
| COUNTY | : | |
| v. | : | |
| | : | |
| | : | |
| PROMATS ATHLETICS, LLC | : | |

Appeal from the Judgment Entered May 7, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 16-3545

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    FILED JULY 10, 2020

Appellant, Wendy Camlin ("Ms. Camlin"), appeals from the May 7, 2019

judgment entered on the jury verdict in this negligence action, finding no

negligence on the part of Appellee, Promats Athletics, LLC ("Promats").  After

careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

This action was initiated on March 11, 2016, with Ms. Camlin's filing of a complaint in Allegheny County against the Office of the Commissioner of Baseball, d/b/a Major League Baseball ("MLB"), the Sports and Exhibition Authority of Pittsburgh and Allegheny County ("SEA"), and the Pittsburgh Associates, LP, d/b/a the Pittsburgh Pirates ("Pirates"). The complaint alleged that the Pirates, the SEA, and the MLB "acted negligently in their breach of the duty to minimize the risk of injury to spectators or patrons at events held at PNC Park." Trial Court Opinion ("TCO"), 7/25/19, at 2.

The trial court summarized the facts that led to the filing of this action, as well as the relevant procedural history in its Pa.R.A.P. 1925(a) opinion:

Ms. Camlin was employed as the Director of Patient Care for Obstetrics and Newborn Services at UPMC in December [of] 2012, a job that required a large time commitment and a large amount of responsibility, as she was accountable for all nursing standards, patient satisfaction, quality initiatives, and safety initiatives for her respective division. Ms. Camlin eventually sought potential employment at a hospital in Boston, Massachusetts[,] for the purpose of advancing her career. In an effort to prevent Ms. Camlin from leaving UPMC, Leslie Davis, the Chief Operating Officer of the Health Services Division of UPMC and the President of Magee Women's Hospital, took accommodating steps to retain her. One of the steps was to take Ms. Camlin to a Pirates baseball game on April 20, 2015, to allow Ms. Camlin to address any concerns she had, and to discuss new opportunities that would be available for career advancement with UPMC.

Ms. Camlin attended the baseball game with Leslie Davis. Approximately 17 days prior to Ms. Camlin and Leslie Davis['s] attending the game, the protective netting behind home plate had been replaced by Promats.... The tickets obtained by [Ms.] Davis provided them with designated seats located in the first row directly behind home plate. While being escorted to their seats by a Pirates[] employee during live play, Ms. Camlin had to turn sideways to avoid coming into contact with the already seated

- 2 -

spectators. In doing so, Ms. Camlin directed her focus to the ground to avoid stepping on the feet of the other spectators. A foul ball then struck the netting behind home plate, which caused the netting to deflect and the baseball to strike Ms. Camlin in the back of her head. As a result of this terrible accident, Ms. Camlin was hospitalized at UPMC Presbyterian University Hospital under the care of Dr. Camiolo Reddy in the concussion program. Dr. Camiolo [Reddy] also supervised other aspects of Ms. Camlin's recovery, such as treatment with neurologists, neurosurgeons, and neuropsychologists. Ms. Camlin experienced difficulty with focus, concentration[,] and short-term memory loss[,] among other symptoms that are alleged to [have] result[ed] from the incident at PNC Park. Prior to her release from the care of Dr. Camiolo Reddy, it was determined by UPMC that Ms. Camlin would not be fit to return to her position as the Director of Patient Care Services, Obstetrics and Newborn Services[,] because she would not be able to meet the intensive time commitments and complex demands of the position.

After the filing of the initial complaint, the Pirates and the SEA joined Promats through a Writ to Join Additional Defendants[,] on October 11, 2016. Significant to this appeal, Count I alleged negligence on the part of Promats because it knew or should have known that the design, manufacture, production, marketing, installation, and/or maintenance of the replaced netting could have caused a batted ball to deflect the netting enough to come into contact with a spectator. On December 6, 2016, Promats initiated a cross claim against the Pirates and the SEA alleging, inter alia, that the injuries and damages sustained by Ms. Camlin were solely, proximately, and legally caused by the conduct of the Pirates and the SEA and[,] alternatively, that Promats is entitled to indemnity and/or contribution.

On August 24, 2018, all parties agreed to dismiss the [MLB,] as there was no evidence that [the] MLB played a role in the injuries sustained by Ms. Camlin. Additionally, the Pirates and the SEA confidentially settled with Ms. Camlin for an undisclosed sum of money[,] on or about November 9, 2018.

Trial was set to begin on November 14, 2018, and after two days of jury selection, the court heard argument on motions in limine. Promats filed a motion in limine to preclude all evidence and argument pertaining to net tension. The court denied this motion on the basis that the jury must be made aware of evidence pertaining to the tensioning of the net despite the fact that there

- 3 -

was no expert testimony on the matter. The court agreed with [Ms. Camlin's] counsel that net installation and tensioning were vital components of the case. Furthermore, a motion in limine was filed on behalf of Ms. Camlin, to preclude Promats from offering evidence pertaining to which party bore the duty of properly tensioning the net. The court denied the motion, finding that it was up to the jury to determine if any of the parties' conduct was negligent[,] related to the net installation and tensioning. The court reiterated and agreed with [Ms. Camlin] that net tension is a significant issue in the case by stating, "I know that you say that it is a tension case. Frankly, I am inclined to agree with that...."

Ms. Camlin [also] filed a motion in limine to preclude testimony from Dr. Ruben J. Echemendia[,] pertaining to Ms. Camlin's disability status. The court granted the motion, explaining its reasoning that Dr. Echemendia's report never expressly says "disabled[."] The court contended[:] "The magic words are 'disabled[,'] but I don't want him to use that, that she is disabled...." Further, the court understood that an inference of Ms. Camlin's compensation could be derived from any testimony of "disability[."] The court ultimately determined that it would be inappropriate and prejudicial to allow Promats to represent to the jury that Ms. Camlin was "disabled" or that she received past disability benefits. However, the issue of whether or not Ms. Camlin could return to work was still open to explore through evidence and testimony.

Both parties filed motions regarding the disclosure of the settlement between Ms. Camlin and the Pirates and the SEA. Promats filed an omnibus motion in limine, which included a motion to inform the jury of Ms. Camlin's settlement with the Pirates and the SEA prior to trial. [Ms. Camlin] filed a motion in limine to preclude evidence of the settlement between [herself] and the Pirates and the SEA to prevent possibly prejudicial evidence from reaching the jury. During argument, Promat[s'] counsel conceded that the current law precludes the disclosure of the settlement[,] but he had to file the motion to preserve the right to take the issue up on appeal. The court denied Promats' motion and granted Ms. Camlin's motion to exclude evidence of the settlement between the Pirates and [the] SEA and Ms. Camlin[,] on November 15, 2018. The rulings on the motions in limine focused the issue before the jury, which was to determine, under a comparative negligence analysis, which party was liable for Ms. Camlin's injuries.

On November 16, 2018, the trial commenced against Promats, the Pirates, and the SEA on the remaining negligence claims. After 10 days of trial over the Thanksgiving break, the jury rendered a verdict on December 4, 2018, finding that the already settled defendants, the Pirates and the SEA, were each 47.5% liable, while Ms. Camlin was 5% liable for her own injuries. Significant to this appeal, the jury found that Promats, the non-settling defendant, was not liable. The jury awarded monetary damages to Ms. Camlin of $54,000.00 for past wage loss and reduced future earning capacity, $200,000.00 for past and present pain and suffering, embarrassment and humiliation, and loss of enjoyment of life, and $200,000.00 for future pain and suffering, embarrassment and humiliation, and loss of enjoyment of life of Ms. Camlin. The damages awarded by the jury amounted to a total of $454,000.00.

On December 14, 2018, a motion for post-trial relief was filed on behalf of Ms. Camlin. [Her] counsel asked the court to order a new trial on liability and damages or in the alternative to enter judgment [non obstante veredicto ("n.o.v.")] on the issues of Promats' negligence and causation and order a new trial on the apportionment of liability and damages. The motion for post-trial relief alleged three errors made during trial. First, [Ms. Camlin] alleged the court failed to appropriately charge the jury on the legal standard for Promats' duty of care [owed] to [her]. Second, [Ms. Camlin] alleged that the weight of the evidence was clearly against the jury's finding of 47.5% liability allocated toward the SEA. Lastly, [Ms. Camlin] alleged that the court permitted opinion evidence to permeate the record from Dr. Eric Fishman, who never testified before the jury and whose opinion that Ms. Camlin could work and was a malingerer was not relied upon by the other expert witnesses. Defense counsel objected to the motion for post-trial relief on December 20, 2018, alleging that [Ms. Camlin's] counsel failed to properly order the entire transcript.

After conferring with both parties, the court ordered[,] on January 17, 2019[,] that a post-trial conciliation would be held on January 29, 2019. At that conciliation, the parties agreed to have the remainder of the voluminous transcript completed and to consider whether or not to arbitrate. On February 1, 2019, the court ordered that the post-trial conciliation be continued to allow [for] further settlement discussions and to outline a briefing schedule. In the event that the parties could not agree to resolve the dispute, the parties were to contact the court after all findings of fact and conclusions of law were filed to schedule argument.

The court, upon request of the court reporter, granted an extension of 21 days to complete the voluminous transcript on February 19, 2019.... Ms. Camlin filed [her] proposed findings of fact on April 4, 2019[,] and ... Promats filed its response on May 6, 2019. Promats subsequently filed a praecipe for entry of judgment on [the] verdict[,] pursuant to Pa.R.[C.]P. 227.4(a)(b)[,] on May 7, 2019, which precluded the court from ruling on Ms. Camlin's post-trial motion.

On May 22, 2019, Ms. Camlin filed a notice [of] appeal ... in reference to the entry of judgment entered on May 7, 2019, pursuant to Pa.R.A.P.[] 341. This court issued an order on June 3, 2019[,] allowing the issues set forth in Ms. Camlin's motion for post-trial relief to function as a concise statement of errors complained [of] on appeal[,] in accordance with [Pa.R.A.P.] 1925(b), or alternatively, to supplement any further errors within 21 days. Ms. Camlin supplemented her statement of errors by timely filing [her Rule 1925(b) statement] on June 17, 2019.

TCO at 2-7 (unnecessary capitalization and citations to record omitted).

Ms. Camlin now presents the following issues for our review:

I.  Did the [t]rial [c]ourt err in refusing to charge the jury on the higher, distinct, and independent duties of care Promats owed to [Ms. Camlin], duties which the Supreme Court of Pennsylvania has adopted through the Restatement (Second) of Torts [(]§§ 299, 299A, 385, and 388[)] and case law throughout the Commonwealth?

II. Did the [t]rial [c]ourt err in denying [Ms. Camlin] a directed verdict after Promats['] representatives testified that its safety netting was designed to protect patrons behind home plate and that Promats' job was to ensure patrons' safety, but Promats never alerted the [Pirates] or patrons of the potential danger that a patron can be struck by a foul ball while behind its alleged safety netting?

III. Can the jury's decision to absolve Promats of responsibility be reconciled with the jury's decision that the Pittsburgh Pirates and the [SEA] were responsible for [Ms. Camlin's] injuries instead of Promats[,] when Promats owed [Ms. Camlin] an even higher, distinct, and independent duty, separate and apart from the [Pittsburgh] Pirates' duties to [her]?

- 6 -

IV. Did the [t]rial [c]ourt err in permitting Promats' counsel to utilize the hearsay report and findings of Dr. Eric Fishman as substantive evidence to cross-examine [Ms. Camlin's] experts notwithstanding the fact that Dr. Fishman did not testify before the jury, was not subject to cross-examination, and whose opinions were not relied upon by other experts who presented expert testimony at trial?

V. Was the jury's decision to allocate 47.5% of liability to the SEA against the weight of the evidence when there was no evidence proffered from either side that discussed [the] SEA's ownership or its possession of PNC Park on the date [Ms. Camlin] sustained her injuries?

Ms. Camlin's Brief at 6.

I. Refusal of Ms. Camlin's Proposed Points for Charge

In her first claim, Ms. Camlin avers that the trial court erred in its instruction to the jury regarding the negligence law and duty of care to be applied to Promats. She bases her argument on her assertion that Promats held itself out as an "expert in safety." Id. at 24, 28. Ms. Camlin insists that because of its "expert" status, the trial court should have instructed the jury that Promats owed her a heightened duty of care, independent of the duty owed by the other defendants. Id. at 28. She further contends that Promats "completely neglected its duties under Pennsylvania law to warn the Pirates and spectators[,] such as [herself,] that the netting it had installed created a false illusion of safety and a hidden danger to its users." Id. Ms. Camlin argues that she was "entitled to have the jury instructed on these well-established facets of the law[,]" and that the trial court erred in refusing to accept her proposed charges regarding Promats' negligence. Id.

Before we address the merits of this claim, we note our standard of review regarding a challenge to jury instructions:

Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case. Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Conversely, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.

The proper test is not whether certain portions or isolated excerpts taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.

In other words, there is no right to have any particular form of instruction given; it is enough that the charge clearly and accurately explains the relevant law.

Krepps v. Snyder, 112 A.3d 1246, 1256 (Pa. Super. 2015) (internal citations and quotation marks omitted).

Here, the trial court provided the jury with the following standard jury instructions relevant to this appeal, based upon the Pennsylvania Suggested Standard Civil Jury Instructions:

13.10 Negligence

In this case, you must decide whether the defendants, the … Pirates and the [SEA,] and the additional defendant[], Promats, were negligent. I will now explain what negligence is. A person must act in a reasonably careful manner to avoid injuring others. The care required varies according to the circumstances and the degree of danger at a particular time. You must decide how a reasonably careful person would act under the circumstances established by the evidence in this case. A person who does something a reasonably careful person would not do under the

circumstances is negligent. A person can also be negligent by failing to act. A person who fails to do something a reasonably careful person would do under the circumstances is negligent.

…

<u>13.70 Negligent Undertaking to Render Services to Protect Others</u>

A person who provides services to protect people or their property must act in a reasonably careful manner. If a party fails to act in a reasonably careful manner, it is negligent. Wendy Camlin, in this case must prove that the … Pirates, the [SEA], and/or Promats was negligent in providing services to protect Wendy Camlin; and either[:]

1. The … Pirates['], the [SEA's], and/or Promats['] negligent conduct increased the risk of harm suffered by Wendy Camlin; or

2. Wendy Camlin suffered injury because she relied on the … Pirates, the [SEA] and/or Promats….

TCO at 14 (citing N.T. Trial, 12/3/18, at 1935-36, 1929-40).

The trial court indicated that the foregoing instructions were based on its concern with "providing the jury with the most logical, clear instruction[,] so as to not confuse or mislead them on the applicable rules of law." Id. Ms. Camlin accuses the trial court, however, of ignoring the premise that Promats owed a duty of care to her, independent of the duties that were owed by the Pirates and the SEA. Ms. Camlin's Brief at 17. The record clearly belies this assertion. The standard jury instructions for 13.10 and 13.70, as well as the trial judge's detailed explanation to the jury of the individual claims against each of the defendants and the concept of comparative negligence, illustrate that the trial court made it clear that Promats could be found liable to Ms.

Camlin, independent of the Pirates and the SEA. See N.T. Trial, 12/3/18, at 1935-40.

Ms. Camlin further argues that the trial court should have charged the jury on a higher standard of care for Promats. Ms. Camlin's argument is based on her theory that Promats held itself out as an "expert" in ballpark safety products. Ms. Camlin's Brief at 24. She relies on the testimony of Sean Whittaker, one of Promats' installers of the netting; Wayne Oliver, the President and CEO of Promats; and J.J. McGraw, the manager of baseball operations for the Pirates, in support of her claim. Significantly, however, the trial court determined that "Promats was under no 'heightened' duty." TCO at 10. The court maintained, rather, that "[t]he duty … Promats owed to Ms. Camlin was properly charged in the context of a comparative negligence analysis with all the other parties' conduct." Id. Ms. Camlin's reliance on a higher duty argument was deemed by the trial court to be "just another attempt by [her] to direct a verdict against the only non-settling defendant[,] Promats." Id.

In support of its finding that no heightened duty of care was owed by Promats, the trial court concluded that Sean Whittaker's testimony did not reveal any alleged expertise on behalf of Promats. Id. at 15. "[Mr. Whittaker] testified that he installed the net, tensioned it to the degree he has seen at other ballparks, and that he received the appropriate approval for the job[] and[,] more importantly[,] the tension of the net[,] from J.J. McGraw." Id. Additionally, Mr. McGraw's testimony revealed that "he was involved in

procuring the netting from Promats," that the netting purchased by the Pirates from Promats was represented by Promats as "lighter, safer, and more fan[-]friendly" than other netting, and that "the net was supposed to be tensioned by Promats." Id. at 16. The trial court determined that "[a] thorough reading of both of those witnesses ... reveal[ed] that neither [witness] stated that Promats was an expert in net tensioning," as suggested by Ms. Camlin. Id.

> Regarding the testimony of Mr. Oliver, the trial court observed:

> Mr. Oliver does testify that Promats has expertise in selling baseball related netting. However, the rest of his testimony does not reveal any expertise related to net tension, nor his own specific experience with installing protective netting. In fact, his testimony again shows Promats' belief that[,] while it was [its] responsibility to tension the net, Promats tensioned the net to the Pirates['] specifications and needs per the contract. Nowhere in his testimony does he state that Promats is, or held itself out to be, an expert in net tensioning. [Ms. Camlin's counsel] did argue this alleged expertise in [his] closing, but it was not charged, and the jury likely rejected the argument. To charge a higher standard of care would have been entirely inappropriate[,] because Promats simply was not an expert in net tensioning. This [c]ourt's charge of 13.10 and 13.70 explained the principle of negligence without misleading or confusing the jury as to Promats['] standard of care.

Id. at 15-16 (citations to record omitted; emphasis added). In fact, the trial court added that Ms. Camlin's own proposed charges included a request that 13.70 be given to the jury. Id. at 16. It was Promats that objected to the inclusion of 13.70 and argued that it would support Ms. Camlin's position that the net was designed to protect her. Despite Promats' objection, the trial court granted Ms. Camlin's request to include 13.70 in the jury charge, "finding it to be an appropriate, clear, and concise charge on Promats'

independent duty after rendering services to protect Ms. Camlin[,] while not

directing a verdict...."  Id. at 17.

The trial court rejected the following additional charges submitted by

Ms. Camlin's counsel:

"Creating" a Condition upon the [L]and on [B]ehalf of the [P]ossessor

One who on behalf of the possessor in a facility or land erects a structure or creates any other condition thereon is subject to liability to others within the facility or land for bodily harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor.

Restatement (Second) of Torts, § 385; Krisovich v. John Booth, Inc., 121 A.2d 890 (Pa. Super. [] 1956).

Foreseeable Dangerous Condition "Created by Contractor"

Even though the owner of the premises has accepted the work, the defendant contractor properly charged with negligence for failing to anticipate and guard against a foreseeable dangerous condition created by the contractor.

Restatement (Second) of Torts, § 385; Prost v. Caldwell Store, Inc., 187 A.2d 273 (Pa. Super. 1963); Krisovich v. John Booth, Inc., 121 A.2d 890 (Pa. Super. [] 1956); Bastl v. Papile, 15 A.2d 476 (Pa. Super. [] 1940).

Unlikely Danger

[Ms. Camlin] must show, and has shown, that the danger was one unlikely to be discovered by the owner of those who come upon the land with the owner's consent.  Thus, liability is imposed upon a contractor where the dangerous condition is not open and obvious.

Restatement (Second) of Torts, § 385; Gresik v. Pa. Partners, L.P., 33 A.2d 594, 597 (Pa. 2011); Gilbert v. Consolidated Rail Corp., 623 A.2d 873 (Pa. [Cmwlth.] 1993).

Want of Competence

> [Ms. Camlin] must show, and has shown in this case, that an act may be negligent if it is done without the competence which [a] reasonable man or company in its position would recognize as necessary to prevent it from creating an unreasonable risk of harm[.]
>
> [Ms. Camlin] must show, and has shown, that Promats…, who marketed itself as a seller of safety products with expertise in the area of safety, and who promotes the sale of products that are designed for safety, is to be held to a higher standard of care than the other defendants in this proceeding because of Promats' claims of expertise.
>
> Restatement (Second) of Torts, § 299; § 299(e)[.]
>
> Undertaking in profession or trade
>
> [Ms. Camlin] must show, and has shown in this case, [that Promats] has greater skill knowledge and knowledge in the trade of net installation and maintenance and has undertaken to render these services in the practice of its profession and trade and as an expert in net installation and maintenance. As such, Promats … is required to exercise, and [sic] skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities. Thus, liability is imposed upon any person or company, such as [Promats], who has failed to exercise this skill and knowledge.
>
> Restatement (Second) of Torts, § 299A[.]

Id. at 11-12 (emphasis in original).

Three out of five of these proposed charges include the phrase, "[Ms. Camlin] must show, and has shown," which prevented the trial court, ab initio, from providing these charges to the jury, as doing so "would have in essence granted a directed verdict on liability against Promats, the only non-settling defendant." Id. at 15. While the other two charges do not contain such language, their titles indirectly suggest a directed verdict. Id. "Both charges could equate … Promats' installation of the net with 'creating' a hazard, thus

- 13 -

likely directing a verdict on Promats' liability. This issue was more clearly explained by the charges actually given." Id. The trial court found Ms. Camlin's proposed charges to be either misleading or confusing. Id.

By providing the standard jury instructions, 13.10 Negligence and 13.70 Negligent Undertaking to Render Services to Protect Others, and refusing to accept the additional charges proposed by Ms. Camlin, the trial court stated that it "provided the jury with the appropriate standards of 'degree of care' and 'duty' in accurate and plain language[,] while specifically preventing the jury from hearing inapplicable law as drafted by [Ms. Camlin]." Id. at 13. The trial court further observed that the alleged "higher" duty Ms. Camlin claims Promats owed her "apparently comes from [her] ephemeral expertise claim related to net tension, when read in conjunction with the Restatement (Second) of Torts §[§] 299, 299A, 385, and 399." Id.[1]

> Section 385 states:
>
> > One who on behalf of the possessor of land erects a
> > structure or creates any other condition thereon is subject
> > to liability to others upon or outside of the land for physical

_____

[1] Section 299 provides: "An act may be negligent if it is done without the competence which a reasonable man in the position of the actor would recognize as necessary to prevent it from creating an unreasonable risk of harm to another." Section 299A dictates: "Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Pursuant to Section 399, "[a] seller of a chattel, manufactured by a third person, who sells it knowing that it is, or is likely to be, dangerous is subject to liability as stated in §§ 388-390." Restatement (Second) of Torts §§ 299, 299A, 399 (1965).

harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others.

Restatement (Second) of Torts § 385 (1965)[.]

The trial court discerned that:

Nowhere does Section 385 state that a "higher" duty is imposed on one who erects a structure on behalf of the possessor of land. In fact, this [c]ourt[']s reading of all the sections of the Restatement relied on by [Ms. Camlin] reveals that nowhere does it state that a "higher" duty should be imposed on Promats. Additionally, [Ms. Camlin] failed to provide any authority which describes the duty in Section 385 as a higher duty. This [c]ourt did agree with [Ms. Camlin's] counsel, and so charged, that the jury may find an independent duty and liability on Promats. However, the charges drafted by [Ms. Camlin] would likely direct a verdict against Promats and confuse or mislead the jury. Ultimately, all the proposed charges were alternatively covered by the Standard Jury Instructions 13.10 and 13.70....

Id. at 13-14. We have carefully reviewed the standard charges provided to the jury and conclude that the trial court accurately explained the law to guide the jury in its deliberations.

Based on the foregoing, we deem Ms. Camlin's argument that the jury should have been instructed regarding a heightened duty of care to be unavailing. A party has no right to have a particular form of instruction, nor is the trial court obligated to temper the contents of the jury instructions to respond to counsel's arguments. Krepps, 112 A.3d at 1257. It is sufficient if the trial court's charge clearly and accurately explains the relevant law and properly conveys the requested point. Id. Discerning no legal error or abuse of discretion, we uphold the trial court's jury instruction.

II. Refusal to Issue Directed Verdict against Promats

Ms. Camlin claims that the trial court erred in denying her request for a directed verdict against Promats. Ms. Camlin's Brief at 38-39. When reviewing an order denying judgment n.o.v.,

> [w]e must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for judgment n.o.v. A judgment n.o.v. should be entered only in a clear case.
>
> American Future Systems, Inc. v. BBB, 872 A.2d 1202, 1215 (Pa. Super. 2005) (citation omitted). Further, a trial court can only enter judgment n.o.v. upon two bases: "(1) where the movant is entitled to judgment as a matter of law; and/or[] (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant." Id. We will reverse a trial court's denial of judgment n.o.v. only where the trial court abused its discretion or committed an error of law that controlled the outcome of the case. See Ty-Button Tie, Inc. v. Kincel and Co., Ltd., 814 A.2d 685, 690 (Pa. Super. 2002).

Hatwood v. Hospital of the University of Pennsylvania, 55 A.3d 1229, 1236 (Pa. Super. 2012) (internal brackets omitted).

Instantly, Ms. Camlin argues that the testimony of Promats' own witnesses, "regarding their knowledge of the hazard, their failure to warn [Ms. Camlin] or the Pirates[,] and [their] acknowledgement that it would have been

- 16 -

prudent to warn the Pirates, supports liability under the proper standard of care under Pennsylvania law." Ms. Camlin's Brief at 39. In support of her claim, Ms. Camlin avers that Promats admitted the netting was designed to protect people seated behind home plate; that part of the installer's job duties included ensuring spectator safety; that it knew prior to Ms. Camlin's injury that a patron taking his or her seat or leaving their seat during play would be in the zone of deflection of the net and subject to injury; and that a fan walking to or from their seat located in the front row may not appreciate the danger to which they would be exposed. Id. at 39-40. Ms. Camlin emphasizes that Promats' CEO, Mr. Oliver, "agreed it would have been prudent to advise the Pirates of this danger." Id. at 41. "Notwithstanding, Promats never notified the Pirates of this hazard, never conferred with the Pirates as to whether the Pirates appreciated the hazard, and never took steps to warn those fans who would be sitting in the hazardous area." Id. Ms. Camlin concludes that the foregoing concession made by Mr. Oliver establishes Promats' liability pursuant to the Restatement (Second) of Torts, § 385 and, therefore, the trial court improperly denied her request for judgment n.o.v. Id. at 41-42.

In support of its denial of Ms. Camlin's request for judgment n.o.v., the trial court explained:

> [T]he [c]ourt found that there were adequate facts to justify the issues going to the jury. Promats owed no heightened duty to Ms. Camlin[,] and Promats' conduct was to be analyzed under a comparative negligence theory, outlined by the [c]ourt's charge of 13.10 and 13.70[,] and further explained to the jury on the verdict slip. In denying the motion for a directed verdict, this [c]ourt found that Mr. Oliver was not admitting Promats' liability

by simply saying that it would have been prudent to tell the Pirates of the potential danger behind home plate. The [c]ourt found this should be another fact that the jury might consider in determining whether Promats was negligent or not.

Clearly, the record is full of facts the jury could have considered in determining the parties' comparative negligence. The jury could have thought that the Pirates had netting for years before this accident, had regularly taken down and tensioned the prior 2013 net, and that they knew or should have known that there was a potential danger behind home plate regardless of what Mr. Oliver said to anyone about anything. The jury could have been persuaded that the Pirates knew that the net deflected, which is further supported by the Pirates own policy not to seat patrons during live play and [to] warn every patron of the dangers of sitting in the first row of the Lexus Club. Certainly, the jury could have relied on Mr. Oliver's testimony as some admission of some liability, which was argued as such by [Ms. Camlin's] counsel in [his] closing argument. But to remove from the jury's consideration the issue of Promats['] negligence based on that one statement would have been improper. It is clear from the jury's verdict that they considered all of the evidence in the case, including Mr. Oliver's statement, and still found that Promats was not negligent and did not violate any duty owed to Ms. Camlin.

TCO at 19. After careful review, we discern that a reasonable basis exists in the record to support the jury's verdict.

Moreover, Ms. Camlin's assertion of liability on the part of Promats under Section 385 ignores comment (c), which states:

A manufacturer of a chattel who puts it upon the market knowing it to be dangerous and having no reason to expect that those who use it will realize its actual condition is liable for physical harm caused by its use (see § 394). As the liability of a servant or an independent contractor who erects a structure upon land or otherwise changes its physical condition is determined by the same rules as those which determine the liability of a manufacturer of a chattel, it follows that such a servant or contractor who turns over the land with knowledge that his work has made it dangerous in a manner unlikely to be discovered by the possessor is subject to liability both to the possessor, and to

those who come upon the land with the consent of the possessor or who are likely to be in its vicinity.

Restatement (Second) of Torts § 385 Comment (c) (emphasis added).

Comment (c) was central to this Court's analysis in Gresik v. PA Partners, L.P., 989 A.2d 344 (Pa. Super. 2009), which involved a negligence action against the owner of a steel mill where a steelworker was injured. In determining whether the defendant was liable for the plaintiff's injuries under Section 385, the Gresik Court analyzed the plain language of Comment (c):

> On two occasions, the comment states that the danger must be of such a nature that it is unlikely to be discovered. Liability under Section 385 is determined by the same rules defining the liability of a manufacturer of chattel. The first sentence of Comment (c) states that a manufacturer of chattel is liable when it supplies a product "knowing it to be dangerous and having no reason to expect that those who use it will realize its actual condition." Restatement (Second) of Torts § 385 Comment (c) (emphasis added). See also Restatement (Second) of Torts § 388, Chattel Known to Be Dangerous for Intended Use (stating that a supplier of chattel that is known to be dangerous may only be held liable if the supplier "has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition"). The comment concludes that it follows, therefore, "that a servant or contractor who turns over the land with knowledge that his work has made it dangerous in a manner unlikely to be discovered by the possessor is subject to liability." Id. Based on the foregoing, we conclude that as a precondition for establishing liability under Section 385, a plaintiff must show that the danger was one unlikely to be discovered by the possessor or those who come upon the land with the possessor's consent.

*Id.* at 350-51 (unnecessary capitalization omitted; emphasis in original).[2]  In Gresik, we concluded that the trial court did not err in granting the defendant's preliminary objections to the plaintiff's claims based on Section 385, because the case involved a danger that was well-known to all relevant parties.  *Id.* at 351.

Promats points out that the reasoning in Gresik was applied by this Court in an analogous situation in Longwell v. Giordano, 57 A.3d 163 (Pa. Super. 2012).  Promats' Brief at 25.  In Longwell, a tenant sued his landlords, Joseph Giordano, Jr. and Beth Lynn Giordano ("the Giordanos"), and a paving contractor, C.J. Long Paving Company ("C.J. Long"), for negligence, after falling off the edge of the driveway in his apartment complex when his shoe caught on the edge of the asphalt.  Six months prior to the incident, the lot had been repaved by C.J. Long.  The tenant alleged his injury was caused by a drop-off that was the result of the repaving work.  Applying the authority of Gresik in Longwell, we concluded that "it cannot be said that C.J. Long made the area of the drop-off dangerous in a way that the Giordanos were unlikely to discover."  Longwell, 57 A.3d at 171.[3]

_____

[2] Our Supreme Court affirmed this decision on other grounds, and never reached the question of how to interpret the relevant language of Section 385 Comment (c).  Gresik v. PA Partners, L.P., 33 A.3d 594, 600 (Pa. 2011).

[3] In Longwell, Mr. Giordano was apparently aware that there was a drop-off, both before and after C.J. Long was hired to add an additional coating of blacktop.  *Id.*  Accordingly the Longwell court upheld the trial court's finding that C.J. Long owed no duty to the Longwells.

Similarly, Promats argues that focusing, here, on the likelihood that the Pirates knew of the potential danger to patrons proves fatal to Ms. Camlin's claim. Promats' Brief at 26. Promats asserts:

[T]he evidence was that the Pirates were very familiar with stadium netting and its tensioning. Brian Stroh, senior vice president of business affairs and general counsel for the Pirates, verified that the Pirates knew the net could deflect toward the patrons.[4] Mr. Stroh confirmed that from the time PNC Park opened in 2001 until 2011, the Pirates' maintenance crew would remove the home plate netting each year and reinstall the start-up process for each season.

Mr. McGraw testified that the Pirates had previously hung nets and set net tensions. The nets had been taken down by Pirates' maintenance crews and re-tensioned on prior occasions. When rehanging the netting, the Pirates' maintenance crew made the decision as to how much tension would be in the netting.

The Pirates' maintenance personnel also decided where the netting would be tensioned and where it would be tied off on the cabling. Promats had no involvement in the tensioning of the PNC Park netting during its first thirteen years of existence, as that was performed by Pirates' maintenance personnel. Mr. Stroh had no information that the netting was previously hung in any manner differently than that which was in place at the time of the incident. The Pirates even trained its ushers to warn the first row patrons at PNC Park of the risk of a deflecting net and baseball....

Id. at 26-28 (citations to record omitted).

When questioned about Promats' installation of the net at the beginning of the 2015 season, Mr. Stroh confirmed that the Pirates' grounds crew "visually inspected that netting from the moment [it was installed] through all

_____

[4] Mr. Stroh confirmed that the Pirates knew "well before" the day of Ms. Camlin's incident that the netting would deflect to some degree when stopping a foul ball; that the Pirates chose where the seats in the stadium would be; and that the Pirates chose the placement of the netting. N.T. Trial, 11/29/18, at 1525-26.

of the games up until the time of [Ms. Camlin's] accident[,]" and that "they never raised any issue with the installation, tension, or any other aspects of the net[.]" N.T. Trial, 11/29/18, at 1529-30. Moreover, Mr. Stroh admitted that it was the Pirates' architects, not Promats, that designed the cabling and net mooring system, as well as the backstop system, which were in place at the time of the April 20, 2015 incident, and that Promats "had nothing to do with designing or installing that distance between the seats and the netting that has existed for 15 years before this accident[.]" Id. at 1530-31.

Additionally, Promats notes that Mr. Whittaker testified that it was neither his nor Promats' decision as to the degree of tension to be applied to the netting. Promats' Brief at 31 (citing N.T. Trial, 11/16/18, at 176.) He explained that Promats' installers would tension the netting similar to what is seen in other ballparks and would then "seek their customer['s] approval and ask them if they want it tightened or loosened." N.T. Trial, 11/16/18, at 179. Moreover, the contract terms between Promats and the Pirates provided that the Pirates were responsible for project "specification compliance." Id. at 221. Based on our review of the record, Ms. Camlin is not entitled to judgment as a matter of law, pursuant to Section 385, as there is sufficient evidence in the record to at least create a jury question regarding whether the Pirates knew of the hidden danger to patrons. We deem no error of law or abuse of discretion by the trial court and, accordingly, we affirm its denial of the motion for a directed verdict.

### III. Reconciling the Jury's Absolution of Promats with its Finding of Liability on the Part of the Pirates and the SEA

Ms. Camlin asserts that the trial court's failure to properly charge the jury led to an irreconcilable result with the jury imposing liability on the Pirates and the SEA, but not Promats. Ms. Camlin's Brief at 43-44. Again, Ms. Camlin's claim is premised on her assumption that Promats should be held to a higher standard of care than the other defendants. Having determined that the trial court properly found Promats did not owe a heightened duty of care, we deem this claim to be meritless.

As determined by the trial court, this is a comparative negligence case. See TCO at 8. The trial court surmised that Ms. Camlin's "intent and sole strategy of going to trial was to single out the only non-settling party, Promats, as an expert in net safety and having a 'higher' duty to [her]." Id. It was Ms. Camlin's choice to confidentially settle with the Pirates and the SEA prior to trial, which resulted in the settling defendants remaining on the verdict slip for the jury to consider. Id. Her decision to settle with two defendants instead of all or none of the defendants acts as a "double-edged sword," e.g.:

> The jury was unaware of the settlement and was tasked with determining, among all the parties, who may have been at fault for Ms. Camlin's injuries. The jury ultimately found the Pirates and [the] SEA liable and awarded money damages against them and not Promats. [Ms. Camlin] now asks this [c]ourt to overturn the jury's decision because of displeasure with the amount awarded, and more significantly, who is liable.

Id. The jury was free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. See Commonwealth v. Houser, 18 A.3d 1128, 1135-36 (Pa. Super. 2011). We will not overturn the jury's

verdict unless it is so contrary to the evidence as to shock one's sense of justice. See Tong-Summerford v. Abington Memorial Hosp., 190 A.3d 631, 659 (Pa. Super. 2018).

Here, we deem the jury's verdict to be consistent with the evidence, as further illustrated by the following statement of the trial court:

> Throughout the 10 days of trial, the jury heard conflicting testimony from both parties on how this terrible accident could have happened. [Ms. Camlin] consistently argued that all their testimony and evidence pointed to Promats as being the only negligent party. [Her] counsel even argued in [his] closing that it was Promats that was negligent, and not the Pirates. However, a review of the entire record supports the jury's verdict and the [c]ourt's charge.
>
> First, inter alia, the jury could have determined that the Pirates and the SEA knew or should have known of the net's deflection and possible intrusion into the first row of patrons. Also, the jury could have considered that there was no expert evidence at all presented that the net was tensioned improperly or installed negligently. The record further reveals that [Ms. Camlin's] own expert, Stanley Meredith, testified that while it was his belief that it was Promats['] duty to tension the net, he admitted that he had not performed any net tension analysis to determine if the net was tensioned incorrectly. Yet another explanation is that the jury could have believed that Ms. Camlin was just too close to the net and that no amount of tension could have prevented this terrible accident if her head was 3½ inches away. [Ms. Camlin's] own accident reconstructionist, Paul Montalbano, testified that based on his analysis, Ms. Camlin's head was 3½ to 6 inches from the net. He admitted that nowhere in his report did he say that Promats is responsible for the accident. More importantly, Mr. Montalbano specifically stated that the jury was responsible for determining fault.
>
> The jury could have considered the testimony of a Pirates' employee of almost 40 years, who testified that the Pirates had a policy predating the accident where the employees were to warn people not to take their seats in the first row during live play because of the potential dangers of the net deflecting.

Additionally, the jury might have considered the testimony that the Pirates and the SEA chose the placement of the seats and cabling design, which Promats was not involved in, nor had the ability to change. Lastly, the jury could have considered that the price quote, which ultimately stood as the contract for the installation of the net between Promats and the Pirates, specifically provided that Promats would install the net, and that the Pirates would approve it. In sum, many of the relevant facts, inter alia, support the jury's verdict.

TCO at 8-10 (citations to record omitted). We discern no abuse of discretion or error of law in the trial court's denial of Ms. Camlin's request for a new trial.

### IV. Allowance of Dr. Eric Fishman's Opinion as Evidence

Ms. Camlin argues that the trial court erred in allowing the inclusion of Dr. Eric Fishman's opinions[5] at trial and that she is, accordingly, entitled to a new trial. Before addressing the merits of this claim, we note:

"The admission or exclusion of evidence is within the sound discretion of the trial court. In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law." Schmidt v. Boardman Co., 958 A.2d 498, 516 (Pa. Super. 2008) (citation omitted).

An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

Jacobs v. Chatwani, 922 A.2d 950, 960 (Pa. Super. 2007).

_____

[5] "Dr. Fishman had been hired by CIGNA to perform an [independent medical evaluation (IME)] of Ms. Camlin in a federal lawsuit for the payment of disability benefits. Dr. Fishman had concluded that Ms. Camlin was a malingerer and could return to work. Dr. Fishman's opinion was discredited in the federal lawsuit[.]" Id. at 21 n.1.

J-A05011-20

Nazarak v. Waite, 216 A.3d 1093, 1100 (Pa. Super. 2019). "An evidentiary ruling which did not affect the verdict will not provide a basis for disturbing the jury's judgment." Hart v. W.H. Stewart, Inc., 564 A.2d 1250, 1252 (Pa. 1989).

Instantly, Ms. Camlin asserts that the "illicit efforts" of Promats' counsel to introduce opinions from Dr. Fishman, "whose opinions were not embraced by others in the proceeding, were prejudicial and forced [Ms. Camlin] to disclose her receipt of disability benefits, which undeniably created prejudice...." Ms. Camlin's Brief at 59. Specifically, Ms. Camlin claims that "it was the utilization of Dr. Fishman's conclusion that [she] was a malingerer, faker[,] and free of disability that was so prejudicial." Id. at 60. Ms. Camlin further avers that "[i]n an attempt to mitigate the harm created by the [c]ourt's erroneous rulings, the jury learned that [she] was the recipient of disability benefits—evidence that would have been otherwise impermissible as a collateral source." Id. at 62 (citing Collins v. Cement Exp., Inc., 447 A.2d 987, 888 (Pa. Super. 1982) ("The collateral source rule prohibits a defendant in a personal injury action from introducing evidence of the plaintiff's receipt of benefits from a collateral source for the same injuries which are alleged to have been caused by the defendant."); Restatement (Second) of Torts § 902A, Comment (c)). Ms. Camlin concludes that "[t]he revelation of [her] receipt of disability benefits offers a viable explanation as to why [she] was not awarded the substantial monetary damages that she was entitled to, and offers an

explanation as to why no pre-trial economic damages were awarded to her."

Id.

In response to Ms. Camlin's claim, the trial court opined:

It is obvious that the jury did not find Ms. Camlin to be a malingerer[.] [O]therwise[,] they would not have awarded her $454,000.00. [Ms. Camlin's] ... claims that the use of Dr. Fishman's report swayed the jury is illogical, counterintuitive[,] and unsubstantiated speculation. A review of the record refutes the contention that the jury was somehow unduly influenced by the use of Dr. Fishman's report during trial. The twisted theory is that the jury heard testimony from the report of [Promats'] discredited expert, Dr. Eric Fishman, who opined that Ms. Camlin was a malingerer, thus adversely impacting her economic damages and credibility, and the credibility of those who supported her claims. Incredibly though, the jury nonetheless awarded Ms. Camlin $400,000.00 in past and future pain and suffering and $54,000.00 in future lost wages. What the [c]ourt suspects is that [Ms. Camlin] is dissatisfied with[:] (1) the total amount of damages awarded[;] (2) that the damages were attributed to the settling parties[;] and (3) that the jury found the non-settling party[,] Promats, not liable. After a review of the record, sufficient evidence is found to support the verdict[] of liability of the Pirates and [the] SEA only.

TCO at 20.

Additionally, Ms. Camlin claims that Dr. Fishman's opinion permeated the record at trial, despite the fact that no expert relied on his opinion, and thereby tainted the jury regarding her credibility, as well as the credibility of her expert witnesses. Ms. Camlin's Reply Brief at 1-3. The trial court found Ms. Camlin's allegation to be misleading. TCO at 20. "If the record is permeated with reference to Dr. Fishman, those references [were] most often introduced by [Ms. Camlin's] counsel, who clearly did a good job of discrediting the report because the jury found for Ms. Camlin." Id. at 21.

Pennsylvania Rule of Evidence 703 provides:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703. Applying Rule 703 in the instant matter, the trial court

limited defense counsel's use of Dr. Fishman's report for possible cross-examination of [Ms. Camlin's] experts and direct examination of the defense medical expert[,] Dr. Ruben Echemendia[,] because Dr. Echemendia had relied on Dr. Fishman's report and testing data in preparation of his opinion. Further, Dr. Fishman was listed as a potential expert witness pretrial[,] and [Ms. Camlin] had copies of his report, yet [Ms. Camlin's] counsel had failed to provide copies of his report to some of their hired experts creating a specific cross[-]examination issue for defense counsel....

Our Supreme Court in Commonwealth v. Thomas, 282 A.2d 693[] (Pa. 1971), clearly held that an expert could base his opinion on materials not actually admitted into evidence if they would be otherwise admissible. In the case sub judice, Dr. Echemendia relied on Dr. Fishman's report and testing data when forming his expert opinion of [Ms. Camlin]. The reliance on the non-admitted expert report and data clearly falls under Rule 703 and complies with the Supreme Court's holding in Thomas. Id. [Ms. Camlin's] counsel admitted that the content of Dr. Fishman's report would be admissible if Dr. Fishman testified.

TCO at 21-22 (unnecessary capitalization, citation to record, and footnote

omitted).

The trial court further noted:

Every expert testified consistent with the jury verdict that Ms. Camlin was not a malingerer[,] including Dr. Echemendia, the only [d]efense medical expert. This [c]ourt emphasizes that Dr. Fishman never testified in this case[,] and his report of malingering was credibly refuted and discredited by [Ms. Camlin's] counsel and by all other medical experts. In spite of all the

> evidence presented to the jury that Ms. Camlin was not a malingerer and none to the contrary included the [d]efense's medical expert[,] Dr. Echemendia, [Ms. Camlin] incredibly argues that the jury was tainted by Dr. Fishman's report.

TCO at 25.

As to Ms. Camlin's assertion that the findings of Douglas King, a forensic economist,[6] were unrebutted and that the sole reason that the jury failed to award her $1.6 million to $2.6 million, the amount of her future economic damages projected by Mr. King, was the jury's exposure to Dr. Fishman's findings, the trial court stated:

> This [argument] ignores that the jury may have found the opinion of Dr. Echemendia more compelling, that Ms. Camlin was not a malingerer, but also that Ms. Camlin was not suffering from brain dysfunction beyond six months post-accident. Dr. Echemendia opined that her inability to work was from her experiencing post-concussion syndrome, which was significantly caused by her self-perception that she was still suffering from a concussion. It also ignores that the jury may have considered that Mr. King had admitted that he was never provided any contrary reports indicating that Ms. Camlin might be able to work cognitively. More importantly, Mr. King testified that if he had been given this information[,] it could have changed his findings. Maybe, the jury found that his findings were based on mere speculation that Ms. Camlin would have gotten the higher paying job in Boston.

Id. at 25 (citation to record omitted). We discern no error of law or abuse of discretion.

Even if the trial court had erred in allowing Dr. Fishman's opinion into evidence, any such error would be deemed harmless. Dr. Fishman's report was only relevant to damages; however, the jury found that Promats was not

---

[6] Mr. King was retained by Ms. Camlin to address the financial impact of her injuries and testified at the trial.

liable to Ms. Camlin and, thus, never reached the issue of damages. "[A]n erroneous evidentiary ruling on damages, in a case where the jury has found for the defendant on the liability issue, is harmless and does not entitle the plaintiff to a new trial." Hart, 564 A.2d at 1252.

V.      Jury's Allocation of Liability to SEA – Weight of Evidence

In her last claim, Ms. Camlin asserts that the jury's decision to allocate 47.5% of liability to the SEA is against the weight of the evidence, as there was no evidence to establish whether the SEA owned PNC Park on the date Ms. Camlin sustained her injuries. Ms. Camlin's Brief at 6, 63-64. We deem the issue regarding the SEA's ownership of PNC Park to be waived, as Ms. Camlin's own complaint named the SEA as a defendant and averred that the SEA not only owned PNC Park at the time this action was initiated, but that it "developed and constructed PNC Park" and "is responsible for the ongoing maintenance and management of PNC Park and has a duty to keep those lawfully on the premises safe from dangerous or hazardous conditions." Complaint, 3/11/16, at 4-5 ¶¶ 19-22. Moreover, Count III of her complaint solely addressed the SEA's liability and expressly stated that "[t]he injuries and damages suffered by [Ms. Camlin] ... were directly and proximately caused as a result of the negligence, carelessness[,] and recklessness of [the SEA]." See id. at 17-21 ¶¶ 61-67.

Additionally, no objection was raised at any time during trial regarding the assessment of liability against the SEA.[7]  Ms. Camlin's counsel did not object to the SEA's inclusion on the verdict slip, nor did he raise any objection after the verdict was read.  See N.T. Trial, 12/3/18, at 1786, 1987-89.  Based on the foregoing, we are constrained to deem this issue waived for failure to preserve this claim before the trial court.  See Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").[8]

Even if this claim had been properly preserved, we would conclude that no relief is warranted.  In determining whether the jury's verdict was against the weight of the evidence, we note our standard of review:

> A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial.  Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the [jury], and viewing the evidence

_____

[7] We rely on Promats' assertion that no objection was made on behalf of Ms. Camlin during trial, see Promats' Brief at 50-51, as Ms. Camlin fails to point to any place in the record where this issue was preserved, and it is not this Court's responsibility to scour the voluminous certified record to prove that she preserved her claim.  See Phillips v. Lock, 86 A.3d 906, 920 (Pa. Super. 2014); Pa.R.A.P. 2117(c).

[8] We acknowledge that Ms. Camlin asserted in her post-trial motion for relief that there was no evidence provided to establish that the SEA owed her a duty.  Post-Trial Motion, 12/14/18, at 3 ¶ 10.  Because this issue was raised for the first-time in her post-trial motion, we maintain that Ms. Camlin failed to preserve this claim at trial.  See City of Philadelphia, Police Dept. v. Gray, 633 A.2d 1090, 1095 (Pa. 1993).

in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion.

Elliott v. Ionta, 869 A.2d 502, 504 (Pa. Super. 2005).

Here, the trial court found the jury's decision to hold the SEA liable to be supported by testimony presented by Promats:

> Specifically, [Promats'] counsel introduced admissions made by the Pirates and the SEA when questioning Mr. Montalbano. [Promats'] counsel asked, "Were you provided with the admissions by the Pirates and the owners of the ballpark, the [SEA], where they acknowledge that the Pirates and their contractors and designers chose the locations of the seats when they built the stadium?" Additionally, testimony was elicited from Bryan Stroh, general counsel for the Pirates, that the SEA owns PNC Park. As this testimony shows that the SEA owned PNC Park when it was built, and that the SEA owned PNC Park at the time Mr. Stroh testified, the jury could then infer, as it was charged on circumstantial evidence, that the SEA owned PNC Park on the date that Ms. Camlin was injured. Thus, the verdict against the SEA is not against the weight of the evidence because there was adequate evidence of record to support the SEA owning PNC Park.

TCO at 26 (unnecessary capitalization and citations to record omitted). We would discern no error of law or abuse of discretion.

Accordingly, we affirm the May 7, 2019 judgment entered on the jury verdict.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2020

- 32 -